## ADOPTION OF VITO.[1]

Suffolk. January 6, 2000. - May 18, 2000.

Present: MARSHALL, C.J., ABRAMS, LYNCH, IRELAND, & COWIN, JJ.

*Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Adoption,* Dispensing with parent's consent, Visitation rights. *Minor,* Adoption, Visitation rights. *Probate Court,* Judicial discretion.

A judge of the Probate and Family Court properly may exercise equitable authority, in the best interests of the child, to order postadoption visitation in a proceeding under G. L. c. 210, § 3, to dispense with parental consent to adoption, and nothing in G. L. c. 210, as amended by St. 1999, c. 3, § 21, governing voluntary postadoption contact agreements between biological and adoptive parents, limits those equitable powers. [556-561]

Discussion of constraints, constitutional and otherwise, on a probate judge's equitable power to order postadoption contact between an adopted child and the child's biological parents and siblings, where such visitation is in the best interests of the child. [561-563]

Discussion of the circumstances under which a judicial exercise of equitable power to order postadoption contact between an adopted child and the child's biological family would be warranted. [563-565]

In the circumstances of a proceeding to dispense with parental consent to adoption, in which the evidence demonstrated that the child had formed strong bonds with his preadoptive family and had no significant existing bond with his biological parents, the judge's determination that the adoption plan was deficient for failure to provide for postadoption contact between the child and his biological family, based on inappropriate speculation about the child's future needs, was clearly erroneous. [565-567] COWIN, J., concurring, with whom LYNCH, J., joined.

In a proceeding to dispense with parental consent to adoption in which parental unfitness was not in issue, the petition should have been allowed, where the best interests of the child did not require otherwise; the matter was remanded for such further proceedings as the judge in her discretion might order. [569]

PETITION filed in the Suffolk Division of the Probate and Family Court Department on February 16, 1996.

The case was heard by *Fernande R. V. Duffly,* J.

---

[1]A pseudonym adopted by the Appeals Court. See *Adoption of Vito,* 47 Mass. App. Ct. 349, 349 n.1 (1999).

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Virginia A. Peel*, Special Assistant Attorney General (*Lynne M. Murphy* with her) for Department of Social Services.

*Andrew L. Cohen*, Committee for Public Counsel Services, for the mother.

*Christin A. Anderson*, for the child, submitted a brief.

MARSHALL, C.J. This appeal arises from the denial of a petition to dispense with parental consent to adoption.[2] The case concerns a child who tested positive for cocaine at the time of his birth in January, 1992, and who has lived with his foster parents (also his preadoptive parents) since he was discharged from the hospital one month after his birth. Vito has never lived with his biological mother.[3] He is now eight and one-half years old.

On February 16, 1996, the Department of Social Services (department or DSS) filed a petition to dispense with parental consent for the adoption of Vito in the Probate and Family Court Department, pursuant to G. L. c. 210, § 3 (1998 ed.).[4] In termination proceedings, a judge must assess the fitness of the parent and the adequacy of the department's adoption plan. See G. L. c. 210, § 3 (*b*), (*c*). The probate judge concluded that the mother was unfit to parent Vito, but found that the department's adoption plan was not in his best interest because it did not provide for significant postadoption contact with Vito's mother

---

[2]This case and *Adoption of Greta*, *post* 577 (2000), were paired for argument in this court. Certain arguments of the parties common to both of the cases are addressed in the case where the discussion is most appropriate.

The amici, The Home for Little Wanderers, Inc., and Massachusetts Appleseed Center for Law and Justice, requested that this court consider for this case their amicus briefs submitted in *Adoption of Lars*, *post* 1151 (2000), which we have done.

[3]Vito's biological father did not object to the department's petition, nor did he appeal. *Adoption of Vito*, *supra* at 351 n.5.

[4]The department obtained permanent custody of Vito within weeks of his birth. The lengthy delay before the petition was filed may be explained by the department's efforts to place Vito permanently with a member of his biological family, by concerns raised by foster care review panels about the cultural and ethnic "inappropriateness" of his foster care placement, and his foster family's temporary change of heart regarding adoption when his foster mother was diagnosed with leukemia, later successfully treated. See *Adoption of Vito*, *supra* at 350 n.2. Nevertheless, we express our concern about any lengthy delay before a young child is placed within the secure environment of a permanent family.

and biological siblings.[5] She denied the petition. The judge provided that, on a timely filing of a motion for reconsideration, she might reconsider the denial and enter a new judgment should the department submit a new adoption plan that provided for postadoption contact between Vito and his biological mother and siblings, including eight yearly visits with his biological mother, as long as the mother is not abusing drugs and the contact continues to be in Vito's best interests.

The department appealed.[6] The Appeals Court vacated the probate decree and directed that a decree enter allowing the department's petition to dispense with consent. *Adoption of Vito*, 47 Mass. App. Ct. 349, 355, 358-359 (1999). The Appeals Court further found the judge's proposal for postadoption visitation was both permissible and sound, but ordered that, given the passage of time, the Probate Court should hear anew any petition for postadoption visitation filed within thirty days. *Id.* We granted the department's application for further appellate review, challenging the judge's requirement of postadoption visitation in the adoption plan and departmental involvement after the adoption.[7]

We vacate the judge's order denying the petition to dispense with parental consent to adoption. The judge's conclusion that the mother is unfit is not challenged.[8] With respect to the judge's denial of the petition based on failure to provide for postadop-

[5]The language of the judgment suggests that the judge was using the term contact to mean visitation. The plan proposed by the department to implement the adoption of Vito by his foster parents contained no provisions for contact with Vito's biological mother or siblings.

[6]Vito did not appeal. Vito's motion to enlarge the time for filing a notice of appeal was denied by the Appeals Court. Vito nonetheless submitted a brief in the Appeals Court, supporting the department's challenge of the decision.

[7]We limited our review to the issues raised by the department's application for further appellate review.

[8]The father did not object to the petition. See note 3, *supra*. The mother did not appeal, but did file a brief in the case, disputing the judge's finding of her unfitness. Because the department claimed the petition should have been allowed based on the finding of her unfitness, the Appeals Court considered the mother's arguments on this point. *Adoption of Vito*, 47 Mass. App. Ct. 349, 351 n.5 (1999). Parental unfitness in termination proceedings must be established by clear and convincing evidence. See *Santosky* v. *Kramer*, 455 U.S. 745, 769 (1982); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 698, 700 (1984). Although we need not review the judge's conclusion that, by clear and convincing evidence, the mother was unfit to parent Vito, see note 7, *supra*, we agree with the reasoning of the Appeals Court and we see no error in this conclusion.

tion contact in the adoption plan, we hold that a judge may order limited postadoption contact, including visitation, between a child and a biological parent where such contact is currently in the best interests of the child. The judge has the authority to ensure that such contact in the best interests of the child is maintained during an appropriate transitional period.

Judicial exercise of equitable power to require postadoption contact is not warranted in this case, however, because there is little or no evidence of a significant, existing bond between Vito and his biological mother, and no other compelling reason for concluding that postadoption contact is currently in his best interests. Vito has formed strong, nurturing bonds with his pre-adoptive family; and the record supports little more than speculation that postadoption contact will be important for his adjustment years later, in adolescence. See *Adoption of Greta, post* 577, 589 (2000). Accordingly, we remand the case to the Probate and Family Court and direct that a decree enter granting the department's petition to dispense with the biological mother's consent to Vito's adoption.

I

We summarize in some detail the findings of fact and conclusions of law made by the judge. In 1990 Vito's biological mother began using crack cocaine, which she continued to do until 1995, with occasional periods of nonuse. Prior to May, 1991, when a judge in the Boston Juvenile Court awarded temporary custody of her three oldest children to the department, see G. L. c. 119, § 24, she had been trading food stamps and using public welfare benefits to purchase crack cocaine. Her children were often left at home alone. When Vito tested positive for cocaine at birth, an abuse and neglect report concerning him was filed two days after his birth, alleging his positive cocaine screen and his mother's failure to obtain prenatal care. See G. L. c. 119, § 51A. The report was substantiated. In February, 1992, the existing care and protection petition for Vito's three older siblings was amended to include Vito, and he was placed in the temporary custody of the department.

Vito was discharged from the hospital one month after his birth and was placed in the home of his foster parents; his siblings had been placed in other homes. In March, 1992, the Boston Juvenile Court ordered the department to assume permanent custody of Vito and his three older siblings; the

mother's whereabouts were unknown to the department at that time.

From the time of his removal from his mother's care in January, 1992, while in the hospital, until January, 1995, his biological mother visited Vito only once.[9] During that ninety-minute visit, Vito responded minimally to his biological mother, withdrew from her and attached himself to his foster mother. At the end of that visit, the mother agreed to visit Vito again at the end of the month, on his first birthday, but although the foster mother and Vito arrived for the birthday visit, the mother failed to attend; she did not telephone to cancel the visit. Following the failed January, 1993, birthday visit, the biological mother made no request for a visit with her son for the remainder of 1993. During 1994 there were no visits with Vito, and little contact between the biological mother and the department; she told the department she had relocated to Florida.

In 1995, while back in Massachusetts in prison on shoplifting charges, Vito's mother signed a department service plan, entered a drug rehabilitation program and began visits with Vito and his siblings.[10] Vito's mother was released from prison in October, 1995. The judge found that the mother's visits with Vito have been generally consistent since March, 1995, and that she has attended monthly supervised visits since her release. The judge found that Vito and his biological mother have "no emotional sharing" between them and remain dissociated, despite pleasant play and conversation. The judge found that Vito did not show any genuine interest in his biological siblings and did not ap-

[9]When the department obtains custody of a child, it has the power to control visits with the child, but in most cases the parents have the right to visit their children if "the welfare of the child and the public interest will not be injured." *Custody of a Minor (No. 2)*, 392 Mass. 719, 726 (1984), quoting G. L. c. 119, § 35. See 110 Code Mass. Regs. § 7.128 (1993) (DSS will plan and promote regular visitation between children in substitute care and their parents consistent with service plan; for department to terminate visitation, judge must find visits will harm child or public welfare, or parental consent must have been terminated).

[10]Because the department now knew where Vito's biological mother was located, it initiated the effort to begin visits between Vito and her. See note 9, *supra*. The first such visit took place in March, 1995, at the Massachusetts Correctional Institution at Framingham. Departmental regulations provide that the department shall make reasonable efforts to work with incarcerated parents to promote a healthy relationship with their children, such efforts to include regular visitation at the correctional facility. See 110 Code Mass. Regs. § 1.10 (1994).

pear to have formed any emotional attachment to his biological mother; he did not appear to be excited to see her and separated from her with no difficulties or emotional overtones. The judge nevertheless made an ultimate finding that Vito had formed "a positive relationship" with his biological mother that has developed since visitation began when she was incarcerated.[11] The judge found that Vito's mother, however, had not fully complied with the department's service plan tasks, and concluded that Vito's biological mother cannot now resume care and custody of Vito because "she has not secured adequate stable housing, has not adequately addressed her issues of lengthy substance abuse history and has not acquired any meaningful parenting skills training." She also concluded that Vito's mother's drug abuse and resultant neglect "was severe and of a lengthy duration," although she had improved in the last two years.

In contrast, the judge found that Vito is "fully integrated into his foster family both emotionally and ethnically." The judge found that it was "important" to Vito to belong to his foster family "because that was the only family he had known," and that "[t]he foster parents are invested in adopting [Vito]; they perceive him as their own son."[12] She found that Vito "has a significant attachment to his foster family," and that separating Vito from his foster family could result in a range of negative responses, from severe depression to less severe trauma.

The judge concluded that, by clear and convincing evidence,

[11]During a May, 1995, visit Vito's mother was seen attempting to interact with Vito, talking to him and exchanging toys. During subsequent visits Vito began to direct more conversation to his mother, although he did not refer to her by name or by any version of "mother." One social worker testified that as Vito began to understand English better, between May and September of 1995, he began to relate better to his mother. Another social worker observed that in 1996 Vito referred to his biological mother as his "other mother." The guardian ad litem reported that Vito told her he liked the visits with his mother and that she brings him toys when they visit.

[12]The guardian ad litem appointed by the court to assess any attachment between Vito and his foster family and biological mother observed that when Vito drew a picture of himself as a baby and his foster mother said, "but your mommy carried you in her belly," Vito responded, "No, you carry me in your belly." The guardian ad litem concluded, and the judge found, this significant interaction indicated Vito's rejection of facts suggesting he was not fully part of his foster family; it was important to belong to the foster family because that was the only family he had known. Vito calls his foster mother "Mom," his foster father "Dad," and his foster siblings his "brothers" and "sisters."

Vito's mother is currently unfit to parent him. She specifically found that the biological mother "lacks the current ability, capacity, fitness and readiness" to parent Vito. Her unavailability to Vito, she concluded, resulted in Vito's "life-long placement with [his foster] family, to which he is now attached." Despite the fact that the biological mother "cares deeply for and has good intentions toward the child," however, "[g]ood intentions . . . are insufficient to establish fitness to parent a child."

The judge further determined that "racial issues *may* at sometime in the future" become a problem for Vito (emphasis added). She found that Vito's relationship with his biological mother is "crucial" for his "racial and cultural development and adjustment," that his best interests will be served by continued "significant" contact with her after any adoption, and that under the department's adoption plan Vito would have limited or no connection to his African-American family or culture.[13] She found that the department's plan is not in Vito's "best interest so long as it does not provide for significant ongoing contact with [his] [m]other and [biological] siblings."

## II

### A

Despite numerous appellate decisions to the contrary, the department argues that there is no authority for the judge to enter an order requiring postadoption visitation in a termination proceeding, pursuant to G. L. c. 210, § 3, or at least, that such an order cannot be made where there is an identified, preadoptive family and the child has no bond with the biological parent. Sixteen years ago we commented on whether "postadoption visitation for the benefit of the child may be ordered" in connection with a decree dispensing with the need for a parent's consent to adoption. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984). We said then that under the terms of G. L. c. 210, § 3 (*c*), "we see no reason why a judge dealing with a petition to dispense with parental consent may not evaluate 'the plan proposed by the department' . . . in relation to all the elements

---

[13]The judge found that there was no evidence that the adoptive family had any significant contacts with the African-American community at this time.

the judge finds are in the child's best interests, including parental visitation."[14] *Id.* We concluded in that case that the equitable powers of courts in this area permit a judge, in her discretion, to evaluate an adoption plan proposed by the department that apparently did *not* contemplate visitation by the mother, and decide whether visitation is in the child's best interests. *Id.* at 702-703, citing *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption,* 385 Mass. 482, 487 (1982). See G. L. c. 215, § 6 (giving Probate and Family Court general equity jurisdiction); *Matter of Moe,* 385 Mass. 555, 561 (1982) ("Our Probate Courts . . . [possess] inherent powers apart from statutory authorization. These powers are broad and flexible, and extend to actions necessary to afford any relief in the best interests of a person under their jurisdiction"). See also note 21, *infra.*

Since our 1984 decision, numerous Appeals Court decisions have expressed an understanding that judges may effect or require postadoption visitation as an outcome of termination proceedings. See, e.g., *Adoption of Vito,* 47 Mass. App. Ct. 349, 354-355 (1999); *Adoption of Lars,* 46 Mass. App. Ct. 30, 34-36 (1998); *Adoption of Hugo,* 44 Mass. App. Ct. 863, 865, 868, *S.C.,* 428 Mass. 219 (1998), cert. denied sub nom. *Hugo P. v. George P.,* 526 U.S. 1034 (1999); *Adoption of Warren,* 44 Mass. App. Ct. 620, 626 n.5 (1998); *Adoption of Nicole,* 40 Mass. App. Ct. 259, 264 (1996); *Adoption of Arthur,* 34 Mass. App. Ct. 1105 (1993); *Adoption of Gwendolyn,* 29 Mass. App. Ct. 130, 137 n.5, 138-139 (1990). See also *Adoption of Kristin,* 43 Mass. App. Ct. 915, 915-916 (1997) (assuming power of probate judge to establish mechanism for biological mother to request postadoption visitation of adoptive parents and for adoptive parents to respond); *Adoption of Abigail,* 23 Mass. App. Ct. 191, 199 (1986) (postadoption visitation may be included in adoption plan). That was a correct understanding of our law.[15]

The concurrence argues that G. L. c. 210, § 3, "does not

---

[14]We affirmed the termination decree in that case, but provided that the trial judge could consider in his discretion any petition filed within thirty days of the docketing of the rescript that the plan proposed by the department be amended to provide for rights of visitation. *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 703 (1984).

[15]We clarify, however, that a judge later fashioning an adoption decree pursuant to G. L. c. 210, § 6, concerning that child, may revisit the question of postadoption contact, if necessary, for the best interests of the child due to changed circumstances. See G. L. c. 210, § 5B. See also *Adoption of a Minor,*

expressly or by reasonable implication" grant the Probate Court
judge the power to order postadoption contact, and that
"[a]bsent such authority . . . this power can[not] be created by
resort to general equity powers." *Post* at 570. The concurrence
would deny in this context the centuries-old equitable authority
of courts to act in the best interests of children, even absent
express or inferable statutory directives, when those children
are properly under the courts' jurisdiction, as they plainly are
here. See, e.g., *Gardner* v. *Rothman*, 370 Mass. 79, 80 (1976)
(general equity jurisdiction of Probate Court extends to persons
and estates of infants); J. Story, Commentaries on Equity
Jurisprudence as Administered in England and America
§§ 1352, 1353 (13th ed. 1886) (in case concerning child, court
"acts throughout with all the anxious care and vigilance of a
parent; and it allows neither the guardian nor any other person
to do any act injurious to the rights or interests of the [child]");
*id.* at §§ 1327-1329, 1333-1334 (long-standing equitable
jurisdiction over persons and property of infants flows from
Crown's general power as parens patriae to protect those who
have no other lawful protector). Following the reasoning of the
concurrence would effectively overturn years of precedent
involving a long line of cases basing the authority of judges to
order postadoption and other visitation on the Probate Court's
equitable authority. See, e.g., *Petition of the Dep't of Social
Servs. to Dispense with Consent to Adoption*, 392 Mass. 696,
702 (1984); *Adoption of Gwendolyn*, *supra* at 137 n.5, 138-
139.[16]

The department acknowledges that our case law has recog-

_____

362 Mass. 842, 845-846 (1973) (agreement made before adoption on post-
adoption visitation that ran counter to requirements of "welfare of the child"
would be unenforceable). Cf. St. 1999, c. 3, § 21 (court issuing termination
decree may approve voluntary agreement for postadoption contact, subject to
final approval by court issuing adoption decree; court shall approve agreement
if it is, inter alia, in best interests of child). The obvious corollary is that a
postadoption visitation order issued by a judge in a termination proceeding
should not be seen or written as a condition on the termination decree. Rather,
it stands as an order associated with the termination decree. Similarly, such an
order should not purport or attempt to condition the later adoption decree
itself. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to
Adoption*, 371 Mass. 651, 656 n.6 (1976) (adoption proceeding is separate
from termination proceeding and must be independently conducted).

[16]The concurrence points to a decision of the Supreme Judicial Court of
Maine, *In re Melanie S.*, 712 A.2d 1036 (Me.1998), vacating, as contrary to
Maine's adoption statute, conditions of a trial court's termination order that

nized that a court may utilize its equitable powers to order post-adoption contact, but, in essence, asserts that the recent legislative amendments to G. L. c. 210 amount to a legislative repudiation of the view that postadoption contact may be judicially ordered.[17] The concurrence similarly argues that the amendments "further support [the] view that the Legislature did not intend that Probate Court judges order postadoption visitation." *Post* at 575. We do not agree. The amendments by their terms were not aimed at overturning the centuries-old equitable authority of courts to act in the best interests of children, when those children are properly under the courts' jurisdiction.

With the possible, narrow exception of postadoption judicial modification of voluntary contact agreements between biological parents and adoptive parents, see G. L. c. 210, § 6D, we see nothing in the relevant, amended provisions of G. L. c. 210 that erodes this long-recognized equitable authority to act in the best interests of the child. Even where biological and prospective adoptive parents do agree on postadoption contact, the Legislature provided for judicial involvement to approve the agreement. See G. L. c. 210, § 6C. It would be anomalous to conclude that such provisions were meant to eliminate entirely judicial involvement in other related contexts.[18] To the contrary, various provisions of the statute mandate that the judge act in

---

required Maine's Department of Human Services to seek an "open" adoption for the children. *Id.* at 1037-1038. The trial court had reasoned that the mother was a person "who so desperately needs her children that she has contemplated suicide if she loses them." *Id.* at 1037. To the extent the Maine trial court mistakenly required postadoption visitation because of the compelling circumstances of the *mother*, and not because of the best interests of the children, we would concur in the Maine high court's vacating of conditions that might be construed as a requirement for postadoption visitation.

[17]In 1999, the Legislature amended provisions of G. L. c. 210 to allow biological parents and adoptive parents to enter into an agreement for postadoption contact. See St. 1999, c. 3, § 21. The amendment provides that "[s]uch agreement may be approved by the court issuing the termination decree under section 3; provided, however, that an agreement under this section shall be finally approved by the court issuing the adoption decree." *Id.* Conditions for court approval of such an agreement include that it has been knowingly and voluntarily entered by all parties. *Id.* The legislation also provides that in enforcing that agreement a court may later limit, restrict, condition, or decrease contact between the biological parents and the child, but may not increase that contact. *Id.*

[18]We note that the decision we reach today — confirming that a judge may exercise equitable power in the best interests of a child to order limited postadoption contact, including visitation, as part of the outcome of termination

those best interests during termination and adoption proceedings. See *Adoption of Tammy*, 416 Mass. 205, 212 (1993). See also G. L. c. 210, § 3 (*a*), (*b*) (court may dispense with need for consent to adoption in best interests of child); *id.* at § 5A (court shall order removal of child from proposed adoptive home if in best interests of child); *id.* at § 5B ("[i]n making orders for adoption, the judge shall consider . . . all factors relevant to the physical, mental and moral health of the child"); *Adoption of Helen*, 429 Mass. 856, 863 (1999) (focus in determining post-termination visitation is on best interests of child). Our decision today is both deferential to and entirely consistent with the "essential particulars" of the statutory adoption scheme of this Commonwealth. *Adoption of Tammy*, 416 Mass. 205, 210 (1993).[19]

Where the 1999 legislative amendments address postadoption contact agreements between biological parents and preadoptive parents in the context of termination proceedings, they presuppose the identification of the prospective adoptive parents at the time the proceedings occur. See St. 1999, c. 3, §§ 17, 21. These statutory postadoption contact provisions do not address those circumstances when termination proceedings occur and there is as yet no preadoptive parent identified. In such circumstances the equitable authority of the judge may be especially important in safeguarding the child's best interests. Even where preadoptive parents are identified and attempt to make an agreement with the biological parents concerning postadoption contact, an impasse may be reached between the parties, as happened in this case.[20] There, the judge's equitable intervention may also be important to move the proceedings forward toward adoption

---

proceedings, while acknowledging that a judge fashioning an adoption decree may revisit that order — is generally consonant with the two-stage judicial review process for certain postadoption contact agreements established under St. 1999, c. 3, § 21.

[19]Our review of the history regarding the bills that led directly to St. 1999, c. 3, reveals no legislative intent to remove a judge's equitable power to require postadoption contact in the bests interests of a child. See generally 1999 House Doc. No. 279; 1999 House Doc. No. 1981; 1999 House Doc. No. 3957; 1999 House Doc. No. 3965; 1999 Senate Doc. No. 843; 1999 Senate Doc. No. 1742; 1999 House J. 55, 59, 64-66, 134-135, 141; 1999 Senate J. 47, 86, 103-105, 113-114; State House News Service (Senate Sess.), March 25, 1999, at 5; State House News Service (House Sess.), Feb. 24, 1999, at 1-2; A Boost for Adoption, Boston Globe, Jan. 5, 1999, at A14 (editorial).

[20]According to the guardian ad litem, the foster parents expressed interest in an open adoption and did not oppose regular contacts between Vito and his

while simultaneously securing postadoption contact that will benefit the child and that all parties want, but on which they cannot quite come to terms. The best interests of a child should not be held hostage to the negotiating skills of adults.

A judge's equitable power to order postadoption contact, however, is not without limit.[21] See *Youmans* v. *Ramos*, 429 Mass. 774, 788 (1999) (Lynch, J., dissenting) ("Although Probate Court judges have broad equitable powers, these powers are not infinite"). This equitable authority does not derive from the statutory adoption scheme, but it must necessarily be attentive to the policy directives inherent in that scheme, as well as to constitutional limitations on intrusions on the preroga-

---

biological family. The judge ordered the parties to meet to discuss the feasibility of an open adoption agreement, but the parties could not come to an agreement.

[21]The concurrence is concerned that we are maintaining an overly broad equitable authority for the Probate Court in adoption matters. *Post* at 571. As this decision and *Adoption of Greta, supra*, make abundantly clear, we do not approve unbounded exercise of equitable authority to order postadoption visitation. The touchstone is limited postadoption contact when there is a compelling reason for the judge to conclude that contact with a biological parent is currently in the best interests of the child. We have "not approve[d] a wide-ranging exercise of authority," *post* at 571, but instead have "carefully delineated criteria the Probate Court should apply," *id.*, in ordering postadoption visitation, consistent with lessons the concurrence would have us draw from *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728 (1977).

We determine that postadoption contact is not warranted here, for example, because there is little or no evidence of a significant, existing bond between Vito and his biological mother, and no other compelling reason for concluding that postadoption contact, even for an appropriate transitional period, is warranted. Our decision is informed by and in accord with the holding of *Superintendent of Belchertown State Sch.* v. *Saikewicz, supra* at 755-756, recognizing the equitable power of the Probate Court to appoint a guardian ad litem "whenever the court believes it necessary to protect the interests of a person in a proceeding before it." *Id.* at 755. The court made explicit the source of its equitable authority: "This power is inherent in the court *even apart from statutory authorization*, and its exercise at times becomes necessary for the proper function of the court" (emphasis added). *Id.*, citing *Lynde* v. *Vose*, 326 Mass. 621 (1951), and *Buckingham* v. *Alden*, 315 Mass. 383, 387 (1944). The court was surely not exercising its equitable authority in that case solely because of an "implied statutory authority." Cf. *post* at 572. Thus, we cannot agree with the concurrence's assertion that "the premise and holding in *Superintendent of Belchertown* seem inconsistent with the later resort by the court to that decision as the touchstone in *Petition of the Dep't of Social Servs., supra*, for the equitable authority for the Probate Court judge to order postadoption visitation." *Post* at 571-572.

tives of the adoptive family. The adoption statute contemplates, for example, that after an adoption decree, "all rights, duties and other legal consequences of the natural relation of child and parent . . . shall, except as regards marriage, incest or cohabitation, terminate between the child so adopted and his natural parents." G. L. c. 210, § 6 (1998 ed.). This provision strongly suggests that in ordinary circumstances adoption is meant to sever most enforceable obligations involving the biological parent with the child. See *Adoption of Tammy*, 416 Mass. 205, 216 (1993) (purpose of § 6 is to protect security of child's newly created family unit by eliminating involvement with child's natural parents). This statutory language is not a bar to judicial orders for postadoption contact, however, because an order for postadoption contact is grounded in the over-all best interests of the child, based on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, not in the rights of the biological parent nor the legal consequences of their natural relation. Cf. G. L. c. 210, § 3 (*b*), (*c*), § 5B. See *Adoption of Warren*, 44 Mass. App. Ct. 620, 626 n.5 (1998) (decision as to postadoption visitation is question more of interests of child than of rights of parent); *Adoption of Abigail*, 23 Mass. App. Ct. 191, 199-200 (1986) (same). See also note 16, *supra*.

Constitutional considerations also guide the exercise of this equitable power. Adoptive parents have the same legal rights toward their children that biological parents do. See G. L. c. 210, § 6. See also *Bottoms* v. *Carlz*, 310 Mass. 29, 33 (1941). Parental rights to raise one's children are essential, basic rights that are constitutionally protected.[22] See, e.g., *Wisconsin* v. *Yoder*, 406 U.S. 205, 232, 233 (1972); *Stanley* v. *Illinois*, 405 U.S. 645, 651 (1972); *Meyer* v. *Nebraska*, 262 U.S. 390, 399 (1923); *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 3 (1979). "It is cardinal with us that the custody, care and nurture of the child reside first in the parents," and in most circumstances we "have respected the private realm of family life which the state

---

[22]In some circumstances, of course, these rights are balanced with the rights and needs of the child. *Opinion of the Justices*, 427 Mass. 1201, 1206 (1998); *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 5 (1979). See *Wisconsin* v. *Yoder*, 406 U.S. 205, 233-234 (1972) (power of parent may be subject to limitation if child's health or safety jeopardized); *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932) (first and paramount duty of courts is to consult welfare of child; parental entitlement to custody of child will not be enforced to detriment of child).

cannot enter." *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944). State intrusion in the rearing of children by their parents may be justified only in limited circumstances.

At a pragmatic level, unnecessary involvement of the courts in long-term, wide-ranging monitoring and enforcement of the numerous postadoption contact arrangements could result from too ready an application of the court's equitable power to issue contact orders.[23] The postadoption contact arrangements contemplated by the judge in this case were both long term and wide ranging, and necessarily would have involved the court in ongoing arrangements between the biological mother and the adopting family for many years to come. But courts are not often the best place to monitor children's changing needs, particularly the needs of young children. What may be in Vito's best interest at the age of five says little about his best interests at age ten or fifteen.

We also recognize the concern raised by the department and the amici that untrammeled equitable power used to impose postadoption contact might reduce the number of prospective parents willing to adopt. Any practice that potentially reduces the pool of prospective adoptive parents raises grave concerns. We note that there are mechanisms to review the adoption plan and reassess it if a particular postadoption contact requirement might be delaying adoption. See Uniform Probate Court Practices Xa (14), (15) (2000) (providing for new court hearing and possible vacating of termination decree where adoption does not occur within specified time).

Where, as here, the child has formed strong, nurturing bonds with his preadoptive family, and there is little or no evidence of a significant, existing bond with the biological parent, judicial exercise of equitable power to require postadoption contact would usually be unwarranted. On the other hand, a judicial order for postadoption contact may be warranted where the evidence readily points to significant, existing bonds between the child and a biological parent, such that a court order abruptly disrupting that relationship would run counter to the child's best interests. See *Youmans* v. *Ramos*, 429 Mass. 774, 783, 785-786 (1999), and cases cited. Cases warranting a postadoption contact

---

[23]We note, however, that the Legislature has already anticipated that some postadoption involvement of the courts may be necessary to enforce or modify postadoption contact agreements between biological and adoptive parents. See St. 1999, c. 3, § 21.

order are more likely to occur where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent.[24] A necessary condition is a finding, supported by the evidence, that continued contact is currently in the best interests of the child.[25] Because an order of postadoption contact affects the rights of the adoptive parents to raise their children, the order should be carefully and narrowly crafted to address the circumstances giving rise to the best interests of the child.

In such cases, the judge has the equitable authority to ensure that contact in the best interests of the child is maintained during an appropriate transitional period posttermination, see *Adoption of Helen*, 429 Mass. 856, 863 (1999), or even postadoption. The purpose of such contact is not to strengthen the bonds

---

[24]Although in this case a preadoptive family was already identified at the time of trial, in many other cases no preadoptive parents have been identified when the parental rights of the biological parents are terminated. In such cases, the State is, in a very real sense, left as the central party responsible for securing the future well-being of these children by locating or approving a new family for them and safeguarding their well-being in the interim. In these circumstances, the court has the authority and responsibility to intervene in their best interests. See *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 756 (1977) (Probate Court is "proper tribunal to determine the best interests of a ward"). See also J. Story, Commentaries on Equity Jurisprudence as Administered in England and America § 1352, 1353 (13th ed. 1886). Where termination proceedings precede adoption, our jurisprudence and statutes implicitly account for the fact that more is at issue than a simple transfer from biological to adoptive parents with the State merely officiating over and formalizing the change. See, e.g., G. L. c. 210, §§ 3, 5B (requiring judge to consider best interests of child in termination and adoption proceedings). Instead, the State is regularly a significant participant in the process, often a central intermediary for a number of months or years in the child's life, with independent responsibility to safeguard the best interests of the child through a difficult, sometimes uncertain transition to a new family.

[25]We focus here on an order requiring postadoption contact between a child and his biological parents. Similar limitations apply to postadoption contact between a child and his biological siblings. But see G. L. c. 119, § 23 (respecting visitation rights of siblings). In the Appeals Court, the department did not "challenge[] the sibling visitation requirement." *Adoption of Vito, supra* at 350 n.4. In its challenge before this court, the department similarly focuses its complaint on the judge's requirement for postadoption contact with the biological mother. While contact with siblings and contact with biological parents may pose different challenges in the adoptive setting, and may be governed by different statutory considerations, in terms of intrusion on the prerogatives of the adoptive family, judicial requirement of contact with biological siblings might not differ significantly from a requirement for contact with parents.

between the child and his biological mother or father, but to assist the child as he negotiates, often at a very young age, the tortuous path from one family to another. See *Youmans* v. *Ramos, supra* at 782-783. See also *Adoption of Hugo,* 428 Mass. 219, 221, 228 (1998). Each day judges must grapple with the consequences of significant relationships that develop between young children and the adults in whose care or custody they are placed. It is for that reason that our jurisprudence has always made the interest of the child paramount. *Richards* v. *Forrest,* 278 Mass. 547, 553 (1932).

Transitional provision for posttermination or postadoption contact in the best interests of the child, however, is a far different thing from judicial meddling in the child's and adoptive family's life, based not on evidence of the emotional ties and current dynamics between the child and the biological parent, but on speculation concerning some hypothetical dynamic between parent and child several years hence, later in adolescence, for example. Parental and familial autonomy cannot be so lightly cast aside. In Vito's case the probate judge apparently favored postadoption contact because she was concerned about Vito's future racial and cultural development and adjustment, presumably based on the guardian ad litem's testimony that transracial adoptees, generally speaking, often have adjustment problems that emerge in adolescence. The judge appears to have inappropriately relied on the guardian ad litem's speculation as to the future need of Vito to have contact with his mother in order to secure his identity years later, in adolescence. That is a matter that is properly left to the wise guidance of Vito's new family. Cf. *Adoption of Gwendolyn,* 29 Mass. App. Ct. 130, 139 (1990) (adoptive parents will be in best position to determine, as child grows up, what visitation is in her best interests).

Looking at the evidence of the actual circumstances of Vito's life and relationships, testimony of the guardian ad litem made clear that Vito's monthly visits with the biological mother had little or no impact on Vito's sense of identity.[26] Rather, the judge's findings reveal that Vito strongly identified with his pre-

---

[26]The guardian ad litem testified that monthly visits with his biological mother have not made a "real impact" on Vito's sense of his own identity. Vito also asserted that there was no evidence presented at trial that supports the judge's finding that he will experience adolescent adjustment problems. There was also no explanation for the judge's conclusion that visitations with Vito's siblings would be in his best interest.

adoptive family, emotionally and ethnically. In the wake of her incarceration, there was evidence that the biological mother "cares deeply for and has good intentions toward" Vito. But there was powerful evidence that there was little or no emotional bonding between them, hardly surprising where Vito has spent his entire life living with, being nurtured and loved by, and identifying with his foster family.

There was also little in the record before us to suggest that Vito's relationship with his biological mother was likely to become important to Vito's adolescent identity. There was evidence of some possible future significance of the relationship in the guardian ad litem's acknowledgment that, generally, adolescence *may* be a time when a transracial adoptee *may* experience adjustment problems, and that Vito would have little connection to an African-American family or culture living with his adoptive family. Generalities about what may be in the best interests of some children, without more, cannot be the basis of judicial orders concerning postadoption contact of a particular child; the best interests of the child standard is one grounded in the particular needs and circumstances of the individual child in question. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252, 266 (1978), quoting *Custody of a Minor*, 375 Mass. 733, 753 (1978).

Assuming that it was proper to use racial grounds for determining Vito's best interest, there was no evidence in the record that showed Vito would be deprived of all African-American contacts in his adolescence if regular visits with his biological mother were not mandated.[27] While Vito's foster family "currently" has no significant contacts with the African-American community, that fact says little, if anything, about

---

[27]The department argued that the probate judge's denial of the petition — based in part on the finding that Vito would have no connection to the African-American community without postadoption contact with his mother, and that his mother would be an important resource as he begins to "address[] racial identity issues" — delayed or even foreclosed Vito's adoption, in violation of the purposes of Pub. L. 104-188, § 1808 (a)-(c). See Pub. L. 104-188, Title I, § 1808, 110 Stat. 1903 (1996) (codified as amended at 42 U.S.C. §§ 671[a], 674, 1996b). The department points specifically to that portion of Pub. L. 104-188 that provides: "[N]either the State nor any other entity in the State that receives funds from the Federal Government and is involved in adoption . . . placements may - . . . (B) delay or deny the placement of a child for adoption . . . on the basis of the race, color, or national origin of the adoptive . . . parent, or the child, involved." *Id.* at § 1808 (a). Because we vacate the denial of the petition on other grounds, we need not reach this question.

contacts that his adoptive family might develop in the future, if this becomes important for their son. We discern no support for a determination that Vito's relationship with his biological mother is "crucial" for his "racial and cultural development and adjustment." Moreover, here the judge found that Vito "is a typical Latino child growing up in a Latino family . . . [and who] describe[s] himself as Latino," who was "fully integrated into his foster family both emotionally and ethnically," and whose physical appearance was not strikingly different from his foster parents. His primary language is that of his foster family, not his biological mother. The judge found Vito "did not manifest any genuine interest in his biological siblings" and did not have an "emotional attachment" to his biological mother.

We conclude, therefore, that, although the probate judge had a statutory mandate to review the department's adoption plan to determine whether the best interests of the child would be served by a termination decree with that plan, see G. L. c. 210, § 3 (*b*), (*c*), and although the judge had equitable authority to order post-adoption contact, including visitation, see *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702-703 (1984), the judge's determination that such postadoption contact was required was clearly erroneous in this case. See *Adoption of Kimberly*, 414 Mass. 526, 529 (1993). We recognize that judges must often make difficult choices, balancing the powerful ties that bind biological mothers to their children, however flawed their behavior to a child may have been, and the rights of children to be protected and nurtured in an often hostile world. Here, the evidence clearly revealed a strong bond to the preadoptive family, the only family Vito has ever known, and little to no attachment by him to his biological mother or his biological siblings. In such circumstances it was inappropriate to stall Vito's adoption at the hurdle of termination proceedings, based on speculation about Vito's need for contact with his biological mother to facilitate his adjustment later in adolescence to his racial identity.

B

The department makes the related argument that the judge cannot properly order it to amend its adoption plan to provide for postadoption contact. The department asserts that a judicial order to amend the department's plan offends the separation of powers mandated by art. 30 of the Massachusetts Declaration of Rights.

The short answer to the department's argument is that in this case the judge did not order the department to amend its plan, but merely refused to issue a termination decree under the department's proposed plan. As noted above, in these termination proceedings the judge is statutorily obligated to assess the adoption plan proposed by the department to determine whether the best interests of the child would be served by a termination decree with that plan.[28] See G. L. c. 210, § 3 (*b*), (*c*). We have already acknowledged that a judge may consider an alternative plan and may "properly order a plan different from the one proposed" by the department. *Adoption of Hugo*, 428 Mass. 219, 234 (1998). See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 6 Mass. App. Ct. 477, 479 (1978) (court directed judge to order department to submit more detailed adoption plan). The judge may also consider a petition to amend the department's plan to provide for rights of contact.[29] See *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 703 (1984). Alternatively, the judge may, as she essentially did here, deny the petition with comment on the deficiencies of the plan. See G. L. c. 210,

---

[28]It is for this reason that we do not agree with the department's assertion that if a parent is found unfit in a G. L. c. 210, § 3 (*b*), proceeding, a termination decree must necessarily issue. This assertion oversimplifies our law; parental fitness is not the only issue to be examined in termination proceedings. In determining whether the best interests of the children will be served by a termination decree, a judge must consider both the ability, fitness and readiness of the children's parents to assume parental responsibility, *and* the adoption plan proposed by the department. G. L. c. 210, § 3 (*b*), (*c*). See *Adoption of Stuart*, 39 Mass. App. Ct. 380, 392 (1995); *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 22 Mass. App. Ct. 62, 68 (1986). See also *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 384 Mass. 707, 709 n.7 (1981) (court must consider adoption plan in proceeding to dispense with consent); *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 376, 379 (1981) (where issue of parental fitness waived, only issue before court was department's plan). Although it need not identify prospective adoptive parents, the adoption plan must provide information with respect to the "prospective adoptive parents and their family environment so that the judge may properly evaluate the suitability of the department's proposal." *Care & Protection of Three Minors*, 392 Mass. 704, 717 (1984). See *Adoption of Stuart, supra* at 393.

[29]The Legislature has provided that in the context of postadoption contact agreements, court modification can decrease or condition postadoption contact but cannot increase the amount of contact. St. 1999, c. 3, § 21. We cannot imagine circumstances that would call for a judge to use her equitable authority to increase postadoption contact.

§ 3 (*b*), (*c*). See also *Adoption of Hugo*, 44 Mass. App. Ct. 863, 866 (1998) (judge has authority to approve or disapprove plan); *Adoption of Stuart*, 39 Mass. App. Ct. 380, 381, 392, 394 (1995) (vacating termination decrees where no written departmental adoption plans in evidence and judge made no findings with respect to plans).

III

The department also argues that the probate judge erred in requiring its continued involvement with the biological mother or the adoptive family postadoption. The issue is not squarely before us because the judge denied the petition and did not directly order the department to continue its involvement post-adoption.[30] Moreover, because we determine that no judicial requirement for postadoption contact was warranted in this case, we need not address here any departmental involvement in such contact.

For the foregoing reasons, the judge's order denying the petition to dispense with parental consent to adoption is vacated. We remand the case to the Probate and Family Court Department and direct that a decree enter granting the department's petition to dispense with parental consent to Vito's adoption. Because several years have passed since judgment was entered in the trial court,[31] the record is unclear as to the scope and depth of any current contact between Vito and his biological mother and siblings. The judge, in her discretion, may, but need not, determine that a further hearing would be helpful to determine whether contact between Vito and his biological mother or siblings during a circumscribed transition period currently would be in his best interests.

*So ordered.*

---

[30]The judgment denying the petition specified that any new plan was to provide that "[s]o long as such contact continues to be in [Vito's] best interests, and [his biological mother] is not abusing drugs, there shall be at least 8 annual, day-time visits with [his biological mother] . . . . Whether there will be additional or overnight visits, or whether any visits are to be supervised or not shall be in the discretion of the Department and/or the adoptive family. [The biological mother] shall participate in random drug screens as may be requested from time to time by the Department of Social Services, as a condition of visitation."

[31]The judge denied the department's petition on October 2, 1997, as of June 19, 1997.

COWIN, J. (concurring, with whom Lynch, J., joins). The court decides today that the general equity power of the Probate and Family Court permits a Probate Court judge, in a proceeding pursuant to G. L. c. 210, § 3 (to dispense with parental consent to adoption), to order postadoption contact, including visitation, between a child and a biological parent. I believe that the statute does not expressly or by reasonable implication grant the Probate Court judge this power. Absent such authority, I do not believe this power can be created by resort to general equity powers. Thus, I concur.

We have stated that, although Probate Court judges have equitable powers, these powers are not limitless. A court has equity jurisdiction in cases in which the subject of the controversy was recognized by courts at common law, but in which the legal remedy is inadequate. *Youmans* v. *Ramos*, 429 Mass. 774, 788 (1999) (Lynch, J., dissenting). *Enos* v. *Correia*, 38 Mass. App. Ct. 318, 323 n.11 (1995). Adoption was not authorized under either the common law of England or the common law of this Commonwealth. See C.P. Kindregan, Jr. & M.L. Inker, Family Law and Practice § 63.1 (2d ed. 1996). It was first recognized in this Commonwealth by statute in 1851, see St. 1851, c. 324, and is now the subject of a comprehensive statutory scheme, see G. L. c. 210. We have acknowledged that "[t]he law of adoption is purely statutory . . . and the governing statute . . . is to be strictly followed in all its essential particulars." *Adoption of Tammy*, 416 Mass. 205, 210 (1993). See *Beloin* v. *Bullett*, 310 Mass. 206 (1941); *Zalis* v. *Ksypka*, 315 Mass. 479 (1944).

The court eschews this basic principle on the ground that the Probate Court judge has equitable power to fashion an order concerning postadoption visitation. *Ante* at 556-561. In support of this statement, the court relies on *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984) (*Petition of the Dep't of Social Servs.*), in which we noted that "[g]iven 'the broad, equitable powers' of courts in this area (*Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482, 487 [1982]), we see no reason why a judge dealing with a petition to dispense with parental consent may not evaluate the 'plan proposed by the department' in relation to all the elements the judge finds are in the child's best interests, including parental visitation." *Id.* The court today concludes that our decisional

law permits the Probate Court judge to order postadoption visitation. *Ante* at 556-560. I am convinced that the equitable power of the Probate Court judge in adoption matters is not as broad as we may have suggested previously, and that our decisional law does not support such an extension of that power.

The support for the equitable power discussed in *Petition of the Dep't of Social Servs.*, *supra*, derives from *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 755-756 (1977) (*Superintendent of Belchertown*).[1] There, in the course of discussing a Probate Court judge's power to authorize a guardian ad litem to assert an incompetent individual's right to refuse medical treatment, we noted that the judge's power "is not limited by any narrow bounds . . . *In re Quinlan*, 70 N.J. 10, 45 (1976) . . . [and] must be broad and flexible enough 'to afford whatever relief may be necessary.' " *Id.*, citing *Strunk* v. *Strunk*, 445 S.W.2d 145, 147 (Ky. Ct. App. 1969).[2] This broad language was not intended to imply that the Probate Court has the power to take *any* action it deems proper. General Laws c. 201, § 6, provides the Probate Court the power to appoint a guardian for a mentally ill individual. Implicit in the power to appoint a guardian is the power to oversee the actions of the guardian whom the court appoints. In *Superintendent of Belchertown*, the Probate Court was exercising its normal and traditional function of supervising guardians. Even so, the court did not approve a wide-ranging exercise of authority, but carefully delineated criteria the Probate Court should apply in overseeing guardians and their decisions on behalf of mentally retarded wards that medical treatment should be withheld. Thus, the premise and holding in *Superintendent of Belchertown* seem inconsistent with the later resort by the court to that decision as the touchstone in *Petition of the Dep't of Social Servs.*, *supra.*, for the equitable authority for the Probate Court judge to order

---

[1]In *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696, 702 (1984), the court cites *Petition of the New Bedford Child & Family Serv. to Dispense with Consent to Adoption*, 385 Mass. 482, 486-487 (1982), which in turn quotes *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728, 755, 756 (1977).

[2]In support of this proposition, the court relied on *In re Quinlan*, 70 N.J. 10, 45 (1976), and *Strunk* v. *Strunk*, 445 S.W.2d 145, 147 (Ky. Ct. App. 1969). Neither of these cases involves a Probate Court judge's powers in an adoption proceeding.

postadoption visitation.[3] Using *Superintendent of Belchertown, supra,* as the basis for this power requires an unwarranted leap. And today *Petition of the Dep't of Social Servs., supra,* is cited as a justification for the court's position.

In *Superintendent of Belchertown, supra* at 755-756, there was implied statutory authority for the court to issue orders regarding the actions of the guardian. I disagree with the court's reliance on *Petition of the Dep't of Social Servs., supra,* because the court in that case misconstrued language in *Superintendent of Belchertown* to conclude that a Probate Court judge has the power to order postadoption visitation without any basis in statutory authority. The Legislature empowered the Probate Court to act in the guardianship area; it has not done so in regard to postadoption visitation. I find nothing in *Petition of the Dep't of Social Servs., supra,* to indicate that the court found that the power to evaluate the propriety of postadoption visitation could properly be implied from the adoption statute, G. L. c. 210.[4] Thus, it being my view that the Probate Court's equitable powers do not by themselves authorize the action in question, I turn to the provisions of G. L. c. 210 to determine

[3]The language from *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 755-756 (1977), that is quoted in *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption,* 392 Mass. 696, 702-703 (1984), as the source of the Probate Court's equitable authority to order postadoption visitation seems particularly problematic because the *Superintendent of Belchertown* decision actually limits, rather than expands, the powers of the Probate Court judge: the decision identifies criteria the judge must apply and does not permit the judge unrestricted authority.

[4]The court also finds support for its position in several Appeals Court decisions. *Ante* 557 (listing cases). Although I recognize that these Appeals Court decisions have interpreted the Probate Court's equity power as encompassing the authority to order postadoption visitation, most of the cases have been premised on *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption, supra,* which is an inadequate source of authority for reading this power into the statute, particularly given the recent amendments to G. L. c. 210, see *infra* at 573-576. See *Adoption of Vito,* 47 Mass. App. Ct. 349, 354-355 (1999); *Adoption of Lars,* 46 Mass. App. Ct. 30, 34-36 (1998); *Adoption of Warren,* 44 Mass. App. Ct. 620, 626 n.5 (1998); *Adoption of Nicole,* 40 Mass App. Ct. 259, 264 (1996); *Adoption of Gwendolyn,* 29 Mass. App. Ct. 130, 137 n.5, 138-139 (1990); *Adoption of Abigail,* 23 Mass. App. Ct. 191, 199 (1986). The remaining cases from the Appeals Court cite no authority for granting the judge the power to order postadoption visitation. See *Adoption of Hugo,* 44 Mass. App. Ct. 863, 865, 868, *S.C.,* 428 Mass. 219 (1998), cert. denied sub nom. *Hugo P.* v. *George P.,* 526 U.S. 1034 (1999); *Adoption of Arthur,* 34 Mass. App. Ct. 1105 (1993); *Adoption of Kristen,* 43 Mass. App. Ct. 915, 915-916 (1997).

whether the Legislature has authorized a Probate Court judge to order postadoption visitation between a child and a biological parent.

General Laws c. 210 provides for a two-stage process: first, for dispensing with the biological parents' right to consent to an adoption; and second, for approving the adoption of a child by new parents. See G. L. c. 210, §§ 3 and 6. Section 3 governs the procedure for dispensing with the biological parents' right to consent to an adoption. Under § 3, the judge must consider the best interests of the child in deciding whether to order dispensation with parental consent. G. L. c. 210, § 3 (*a*) (ii). *Adoption of Inez*, 428 Mass. 717, 720 (1999). An order to dispense is only proper after a determination that "a parent is currently unfit to further the child's best interest." *Adoption of Paula*, 420 Mass. 716, 731 (1995).

Section 6 permits the Probate Court judge to enter a decree authorizing the adoption. Before issuing the decree, the Probate Court judge must be satisfied "that the petitioner is of sufficient ability to bring up the child and provide suitable support and education for it, and that the child should be adopted." G. L. c. 210, § 6. Once the decree is entered, the adoptive parents assume all the rights and obligations of the biological parents and the rights and obligations of the biological parents terminate. *Id.*

Neither § 3 nor § 6 provides the Probate Court judge with the implied authority to order postadoption visitation. In fact, allowing the judge to order postadoption visitation is in some respects inconsistent with the primary purpose of these statutory sections: i.e., to provide for the complete transition of a child from unfit parents into a more stable home environment. The first stage in this transition requires the judge to determine whether the best interests of the child mandate that the rights of the biological parents to consent to an adoption be terminated. The judge is instructed to evaluate a nonexclusive list of factors to determine whether the child's biological parents, by their lack of fitness, have forfeited the right to consent to an adoption. G. L. c. 210, § 3 (*c*). The thrust of the § 3 inquiry is to evaluate the past conduct of the biological parents in order to determine whether dispensing with parental consent to adoption would be in the child's best interests. Although the judge is also to consider the plan proposed by the Department of Social Services (department) for the future of the child, nothing in § 3 indicates a legislative intent to permit the judge to continue

contact between the biological parent and the child after an adoption. That section is a mechanism for severing the rights of the biological parents to consent to an adoption.

Section 6 completes the child's transition from the biological to the adoptive parents. The purpose of § 6 is to terminate all rights and obligations of the biological parents and to transfer all those rights and obligations to the adoptive parents. G. L. c. 210, § 6. See *Adoption of Tammy*, 416 Mass. 205, 216 (1993); *Goldman, petitioners*, 331 Mass. 647, 652 (1954); *Bottoms* v. *Carlz*, 310 Mass. 29, 33 (1941). The termination provision "protect[s] the security of the child's newly-created family unit by eliminating involvement with the child's natural parents." *Adoption of Tammy, supra.*

Allowing the § 3 judge to order postadoption visitation conflicts with this statutory framework. By removing the child from his biological parents and placing full parental authority with the adoptive parents, the Legislature has intended to provide a complete severance from the biological parents and a new beginning for the child. There is no suggestion or even intimation that the Legislature had any desire to authorize continuing contact between the child and the biological parents.

Authorizing the Probate Court judge to order postadoption visitation conflicts with the Legislature's expressed purpose of vesting all parental prerogatives in the adoptive parents because in many circumstances the adoptive parents will object to continuing contact between the child and the biological parents.[5]

In 1999, the Legislature added new provisions to the adoption statutes. See St. 1999, c. 3, §§ 17 and 21. These new provi-

___

[5]In a similar situation, the Supreme Judicial Court of Maine concluded that a trial court exceeded its statutory authority in terminating a biological mother's parental rights on the condition of posttermination contact between the biological mother and the adoptive parents. See *In re Melanie S.*, 712 A.2d 1036, 1036 (Me. 1998). There, in the face of the compelling circumstance of a biological mother who had contemplated suicide if she lost all contact with her children, the Supreme Judicial Court determined nevertheless that the plain language of the statute governing the termination procedures mandated that "a termination order sever the relationship between parent and child." *Id.* at 1037.

The opinion of the court today states that the basis of the Maine court's decision was that the trial court erred by considering the mother's interests. But the parent-child dichotomy was not meaningful to the Maine court's decision. The Maine court states that the trial court does not have the authority to order posttermination contact, even if such contact were ordered in the interests of the child.

sions further support my view that the Legislature did not intend that Probate Court judges order postadoption visitation.[6] The 1999 amendments rewrote § 3 and added §§ 6C, 6D and 6E to G. L. c. 210. *Id.* By enacting these amendments, the Legislature recognized that adoptive and biological parents may make agreements for postadoption contact. G. L. c. 210, § 6C. An agreement may be approved by the judge during the § 3 proceeding, but must also be approved by the judge during the § 6 proceeding. The judge must approve the agreement as long as it is in the best interests of the child, is fair and reasonable, and has been entered into knowingly and voluntarily by the parties. *Id.* A judge may order specific enforcement of the agreement; however, during an enforcement proceeding the judge may only limit, restrict, condition, or decrease contact with the biological parents, but may not increase the amount of contact or place new obligations on the adoptive parents. G. L. c. 210, § 6D. The Legislature instructed that these new sections should not be interpreted to "abrogate the right of an adoptive parent to make decisions on behalf of his child." G. L. c. 210, § 6E. To make the existing § 3 consonant with these new sections, the Legislature also revised § 3 expressly to allow biological parents whose right to consent to an adoption has been terminated to enter into a postadoption visitation contract once the adoptive parents have been identified subject to the conditions in §§ 6C-6E. St. 1999, c. 3, § 17. The Legislature further revised § 3 to provide that the biological parents and the petitioner seeking to terminate the biological parents' right to consent to an adoption may make agreements for posttermination contact between the biological parents and the child and the § 3 judge may resolve matters concerning these agreements.[7]

These amendments have a specific scope. Their purpose is to permit agreements between biological and adoptive parents that provide for postadoptive contact. The judge's power is limited

---

[6]Whether St. 1999, c. 3, is retroactive need not be resolved on the present record. The issue is not whether that statute applies to a proceeding conducted before its enactment; the issue is whether St. 1999, c. 3, illuminates the meaning of the statutory framework which already existed at the time of the hearing to dispense with consent to adoption. For reasons set forth in the body of this concurring opinion, I believe that it does so.

[7]The logical corollary to this provision in § 6D is that a judge who may approve a postadoption agreement during the § 3 proceeding is not permitted to increase the contact between the child and the biological parents either.

to approving the agreement and reducing or conditioning the contact between the child and the biological parents. The judge is not empowered to expand the agreement. It is incongruous to believe that the Legislature would expressly deprive the court of the right to expand postadoption visitation when an agreement exists, but yet, in the absence of an agreement, grant the court broad power to order visitation.

The Legislature's decision to limit postadoption visitation to agreements between the adoptive and biological parents is consistent with the established purpose of § 6. As discussed *supra*, § 6 is designed to assure that the adoptive parents assume full authority to make decisions on behalf of the child. See *Adoption of Tammy, supra*. By limiting postadoptive visitation to agreements entered into by adoptive parents, the Legislature, consistent with § 6, assures that the locus of visitation decision-making resides with the adoptive parents.

The Legislature, in § 6E, expressly recognized the limited scope of the 1999 amendments. By providing that §§ 6C and 6D do not "abrogate the right of an adoptive parent to make decisions on behalf of his child," the Legislature cautioned that these new sections should be narrowly construed with an eye toward protecting the decision-making authority of the adoptive parents. In my view, the Legislature's addition of § 6E indicates a clear intent that §§ 6C and 6D not upset the long-established purpose of § 6 to place the decision-making authority for the child with the adoptive parents.

I note further that the department argues for the position that I have expressed. Traditionally, "we 'accord due weight and deference to an agency's reasonable interpretation of a statute within its charge.' " *Hayes* v. *Retirement Bd.*, 425 Mass. 468, 470 (1997), quoting *Boston Neighborhood Taxi Ass'n* v. *Department of Pub. Utils.*, 410 Mass. 686, 692 (1991).

A coherent statutory framework exists in G. L. c. 210, §§ 3 and 6. The 1999 statute is consistent with and illuminates the preexisting law. But the court, by virtue of the "equitable power" of the Probate Court and what I consider a misreading of *Superintendent of Belchertown*, adopts a policy that I believe is inconsistent with legislative intent, at least as that intent has been expressed to date. I, therefore, respectfully concur.