## ADOPTION OF EDGAR
(and a companion case[1]).

No. 06-P-211.

Worcester. May 17, 2006. - September 14, 2006.

Present: MILLS, SMITH, & KATZMANN, JJ.

*Parent and Child,* Adoption. *Adoption,* Visitation rights. *Minor,* Adoption, Visitation rights.

A Juvenile Court judge did not abuse his discretion in revising an order that provided for mandatory postadoption visitation of children with their biological parents to permit visitation only at the discretion of the adoptive parents, where such a revision was warranted by changed circumstances and the evolving best interests of the children. [370-375]

PETITION filed in the Worcester Division of the Juvenile Court Department on May 18, 1998.

A motion for reconsideration of a postadoption visitation order, filed on June 30, 2004, was heard by *Louis D. Coffin,* J.

*Margaret M. Geary* for the children.

*Lisa J. Campbell* for the mother.

*Brian R. Pariser* for Department of Social Services.

KATZMANN, J. This case presents the question of when and to what extent a judge may revise an order allowing for visitation of children with their biological parents after the parental rights of the biological parents have been terminated and adoptive parents have been identified. A Juvenile Court judge revised an existing order for mandatory postadoption visitation by permitting visitation only at the discretion of the adoptive parents. Both the biological parents and the children appeal the revised order. We conclude that, due to changed circumstances, the revision was permissible.

*Background.* In 1998, the Department of Social Services

---

[1]Adoption of Sara. The children's names are pseudonyms.

(DSS) filed a care and protection petition on behalf of four children: Edgar, who was born on August 3, 1991; Sara, who was born on April 30, 1993; and two younger children who are not part of this appeal. In 2001, after a trial, the judge terminated the biological parents' parental rights.[2] The judge also ordered bi-weekly posttermination visits for three months and monthly visits for the following three months, after which visits were left to the discretion of DSS. The children had their last visit with their biological parents in June, 2002. In April, 2003, DSS identified preadoptive parents willing to adopt all four children and placed them together into that preadoptive home. Ultimately, all four children were adopted by their preadoptive parents on November 19, 2004.

On August 1, 2003, the judge, who was then unaware of the children's recent April, 2003, placement, issued findings of fact relative to the earlier decrees terminating parental rights. Based on these findings, he ordered that Edgar and Sara have at least two postadoption visits each year with their biological parents (original order). Further visitation, as well as all visitation in regard to the two younger children, was left to the discretion of prospective adoptive parents. The biological parents appealed the decrees, and on March 2, 2004, this court affirmed. *Adoption of Edgar*, 60 Mass. App. Ct. 1119 (2004). See note 2, *supra*.

On June 30, 2004, DSS moved for reconsideration of the original postadoption visitation order, requesting that all decisions regarding visitation be left to the discretion of the adoptive parents. The biological parents and Edgar and Sara opposed that motion. The judge conducted an evidentiary hearing on the

---

[2]This court, in an unpublished memorandum and order pursuant to rule 1:28 affirming the decrees, noted

> "a long history of abuse and neglect of the four children; the parents' chronic transiency and their failure to meet the children's basic needs including housing; the mother's mental illness and her inability to handle her finances; the father and the mother's boyfriend's history of substance abuse and their failure to comply with [DSS's] service plans; and the parents' continuing failure to resolve their problems despite the services made available to them by [DSS] and several other agencies and resources."

*Adoption of Edgar*, 60 Mass. App. Ct. 1119 (2004).

motion on August 18, 2004, at which the preadoptive mother testified.[3] The judge allowed the motion on September 15, 2004, revising the postadoption visitation order to read: "Visits and contacts by all four children with their biological parents are best left in the hands and discretion of their adoptive parents." Edgar, Sara, and the biological parents appealed the revised order.[4]

*Discussion.* At the outset, we note that central to the arguments presented by the parties is *Adoption of Vito*, 431 Mass. 550, 557 (2000), where the Supreme Judicial Court held that a judge may order postadoption visitation in connection with termination proceedings if it is in the child's best interests. While it appears that there is no reported decision that addresses the circumstances posed here — the revision of a post-termination or postadoption visitation order — *Vito* and other case law provide the principles that guide our analysis.

First, the source of the judicial power to order postadoption contact is rooted in the "centuries-old equitable authority of courts to act in the best interests of children." *Id.* at 559. "This equitable authority does not derive from the statutory adoption scheme, [G. L. c. 210,] but it must necessarily be attentive to the policy directives inherent in that scheme, as well as to constitutional limitations on intrusions on the prerogatives of the adoptive family." *Id.* at 561-562.

Second, in evaluating the best interests of a child with respect to postadoption visitation, a judge should focus on "emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent, [and not on] the rights of the biological parent nor the legal consequences of

[3]Neither Edgar nor Sara testified at that hearing. The judge stated in his posthearing memorandum that, "[a]ccording to their attorney, [Edgar] wants to have ongoing contact with his parents, with a visit once a year [and] . . . . [Sara] wants another 'goodby visit.' " Although Edgar was summonsed to appear at the August 19, 2004 hearing, according to the unchallenged testimony of his adoptive mother (which was accepted by the judge), Edgar "did not want to come to Court."

[4]On November 15, 2004, DSS and Edgar and Sara entered into a stipulation agreeing that, if the children were adopted before the children's appeal from the September 15, 2004, postadoption visitation order were resolved, DSS would not argue that the appeal should not be decided because the children had been adopted. Four days later, as noted *supra*, the children were adopted.

their natural relation." *Id.* at 562. Third, "[a]doptive parents have the same legal rights toward their children that biological parents do." *Ibid.* "[I]n ordinary circumstances adoption is meant to sever most enforceable obligations involving the biological parent with the child." *Ibid.* Thus, a judge should generally avoid "unnecessary involvement of the courts in long-term, wide-ranging monitoring and enforcement of the numerous postadoption contact arrangements." *Id.* at 563. Fourth, in considering whether to impose postadoption contact, judges should be mindful that such practice may have the deleterious impact of reducing the pool of prospective parents. *Ibid.*

Fifth, a judge should recognize when visitation would "usually be unwarranted," and when it "may be warranted." *Adoption of Vito, supra.* "Where a child has 'formed strong, nurturing bonds with his preadoptive family, and there is little or no evidence of a significant, existing bond with the biological parent, judicial exercise of equitable power to require postadoption contact would usually be unwarranted.' *Ibid.* In contrast, '[c]ases warranting a postadoption contact order are more likely to occur where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent.' " *Adoption of Terrence,* 57 Mass. App. Ct. 832, 839 (2003), quoting from *Adoption of Vito, supra* at 563-564. "In such cases, the judge has the equitable authority to ensure that contact in the best interests of the child is maintained during an appropriate transitional period posttermination, . . . or even postadoption. The purpose of such contact is not to strengthen the bonds between the child and his biological mother or father, but to assist the child as he negotiates, often at a very young age, the tortuous path from one family to another." *Adoption of Vito, supra* at 564-565.

Sixth, "[t]ransitional provision for posttermination or postadoption contact in the best interests of the child" should be based on the *"current* dynamics" and "emotional ties" between the child and the biological parent. *Id.* at 565 (emphasis supplied). "[T]he fluid nature of the best interests of the child standard requires that all evaluations of such nature be made based on the current best interests of the child." *Adoption of Pierce,* 58 Mass. App. Ct. 342, 349-350 (2003).

Seventh, "[o]nce it is established that a parent is unfit, the decision whether to grant postadoption [or posttermination] visits must be left to the sound discretion of the trial judge." *Adoption of Terrence, supra,* quoting from *Adoption of John,* 53 Mass. App. Ct. 431, 439 (2001). See *Adoption of Saul,* 60 Mass. App. Ct. 546, 555 (2004).

In light of these principles, we conclude that the judge did not abuse his discretion in revising the visitation order in September, 2004. While the propriety of that order rests upon the new set of circumstances that were presented to the judge as the basis for the motion for reconsideration, reference to the circumstances extant for the earlier July, 2003, order reinforces and provides context for our determination that the judge's revised order should not be disturbed.

In his September, 2004, order, the judge observed that when the original postadoption visitation order was issued in July, 2003, the evidence was that Edgar and Sara were in one foster home, and the two younger children were in another. Neither home was preadoptive, and although DSS planned to search for a single adoptive family, the chance of success appeared to be "unlikely." While the biological parents displayed a "poor track record of not following directions and Orders from the Court," as well as being "deceptive reporters," the judge, citing *Adoption of Vito,* 431 Mass. at 562, determined that visitation was then appropriate for Edgar and Sara based upon his analysis of the "emotional bonding and other circumstances of the actual personal relationship of the biological parents and the children." The judge found that the biological parents had visited regularly with Edgar and Sara, that Edgar and Sara "enjoyed their visits," that they were "the most attached" of the four children to their biological parents, and that they had expressed a desire to go home." The judge also found that there was no evidence to suggest that any of the children had "an appreciable bond with a foster parent." Based upon these considerations, the judge found that limited postadoption visits were then in Edgar and Sara's best interests.

The balance of these considerations had drastically shifted by the time of the judge's September, 2004, revised order, as the judge himself noted. By then, Edgar and Sara had not seen their

biological parents in two years. Unexpectedly (and happily), an adoptive home had been found where all four children could live together, and they were all adjusting well to their new family and environment. Indeed, the children were "thriv[ing]" in the care of their adoptive parents, who they called "Mom" and "Dad.". The adoptive mother "demonstrated in her testimony that she has good insight, and understands the character traits and needs of each of the children." The adoptive mother had expressed concern that mandatory visits for Edgar and Sara "might trigger behavioral repercussions or a relapse to the sort of problems [Edgar and Sara] were having when they arrived" in the adoptive parents' home. There was no evidence that the biological parents' circumstances had changed in any meaningful way. Again, citing the *Adoption of Vito, supra* at 562, court's directive to focus "on emotional bonding and other circumstances of the actual personal relationship of the child and the biological parent," the judge concluded that mandatory contact postadoption was no longer appropriate and that future visitation ought to be determined by the adoptive parents. See *Adoption of Greta*, 431 Mass. 577, 588-589 (2000); *Adoption of Terrence, supra.*

Quite properly, the judge's September, 2004, revised order reflected the principle that given changed circumstances and evolving best interests, court orders regarding conditions of visitation are subject to revision. See *Adoption of Vito, supra* at 563 ("[w]hat may be in [a child's] best interest at [an earlier age] says little about his best interests [as he gets older]"); *Adoption of Gwendolyn*, 29 Mass. App. Ct. 130, 139 (1990). Edgar and Sara, and the biological parents, argue that there was really no change in circumstances, since the original July, 2003, order was issued in the hope that all four children would be adopted by the same family. Therefore, they contend, that visitation order contemplated the very situation in which the children now live. This argument misapprehends the nature of the judge's inquiry. In deciding on postadoption visitation, the judge is to evaluate the present state of emotional bonding and the relationships of the children with their biological parents and must take into account whether there is an identified preadoptive family or whether there is a preadoptive family with whom the child

has "strong, nurturing bonds." *Id.* at 562-564. Here, whatever the judge may have hoped for when he entered the July, 2003, order, he based his order then on the fact that the children were not living with preadoptive parents with whom they had a bond, but did have a parent-child relationship with their biological parents. It is undisputed that these circumstances had changed by September, 2004, when the judge revised his original order.

Finally, the children and the biological parents argue that the judge erred in revising the order for postadoption visitation because there was no showing of a "material and substantial change in circumstances," as required by G. L. c. 210, § 6D, inserted by St. 1999, c. 3, § 21. Quite apart from the fact that, as detailed above, there was such a change, the children and the biological parents are mistaken in seeking to apply the provisions of G. L. c. 210, § 6D, to this case. Section 6D, by its very terms, only applies to a court-approved agreement for postadoption contact.[5] See *Adoption of Vito, supra* at 559. It is a specific statutory remedy for enforcement of agreements for postadoption visitation that are entered into knowingly and voluntarily by the parties. This case however involves not an agreement among parties, but a court order for postadoption contact. Its source is the court's equitable powers, and as such, it can only stand so long as it continues to be equitable. See *Adoption of Vito, supra* at 559-560.[6] Here, because of changed circumstances, the judge did not abuse his discretion in determining that it was

---

[5] General Laws c. 210, § 6D, states: "In an enforcement proceeding, the court may modify the terms of the agreement if the court finds that there has been a material and substantial change in circumstances and the modification is necessary in the best interests of the child. A court-imposed modification of a previously approved agreement may limit, restrict, condition or decrease contact between the birth parents and the child but in no event shall a court-imposed modification serve to expand, enlarge or increase the amount of contact between the birth parents and the child or place new obligations on adoptive parents."

[6] The biological parents also argue that DSS erred procedurally by requesting revision of the order through a Mass.R.Civ.P. 60(b), 365 Mass. 828 (1979), motion. DSS responds that it was simply asking for modification of the order and was only analogizing to a rule 60(b) situation in explaining its request. Ultimately, the parties agree that a judge has the power to revise a postadoption visitation order under some circumstances. Because we conclude that those circumstances were met in this case, we need not address this argument.

no longer in the children's best interests to have court-ordered postadoption visitation and that the adoptive parents were in the best position "to monitor [Edgar's and Sara's] changing needs." *Id.* at 563. See *Adoption of Gwendolyn, supra.* Accordingly, the revised order leaving postadoption visitation to the discretion of the adoptive parents is affirmed.

*So ordered.*

---

The biological parents also argue that two of the judge's findings in the September 15, 2004, memorandum were unsupported by the record. Because these two findings are unrelated to the state of the children's emotional bonding and personal relationships with their biological parents, they are not essential to the judge's ruling, or our conclusion on appeal.