792

[889 NYS2d 902]

In the Matter of Imani W., a Child Alleged to be Permanently Neglected. Christina W., Respondent.

Family Court, Monroe County, November 27, 2009

**APPEARANCES OF COUNSEL**

*Patricia A. Woehrlen* for petitioner. *Robert P. Turner* for respondent. *Brian A. Strait* for the child.

## OPINION OF THE COURT

DANDREA L. RUHLMANN, J.

Court-ordered post-termination contact between respondent mother and her four-year-old daughter is denied. Respondent Christina W.'s parental rights were terminated as she is unable by reason of mental illness to provide proper and adequate care for her daughter, Imani W. (date of birth: xx/xx/2005), who has been in petitioner Monroe County Department of Human Services's care since about the time of her birth (Social Services Law § 384-b [6] [a]). Respondent failed to prove that such continued visitation is in Imani's best interests.

The New York State Supreme Court, Appellate Division, Fourth Department, now requires courts to consider whether it is in the best interests of a child to continue to visit with a parent whose rights have been terminated—on any grounds—when such contact is requested by the parent (and/or presumably the child) (*Matter of Kahlil S.*, 35 AD3d 1164, 1166 [4th Dept 2006], *lv dismissed* 8 NY3d 977 [2007]; *see also Matter of Seth M.*, 66 AD3d 1448 [4th Dept 2009]; *Matter of Samantha K.*, 59 AD3d 1012 [4th Dept 2009]; *Matter of Josh M.*, 61 AD3d 1366 [4th Dept 2009]; *Matter of Bert M.*, 50 AD3d 1509 [4th Dept 2008], *lv denied* 11 NY3d 704 [2008]; *contra Matter of John KK.*, 34 AD3d 1050 [3d Dept 2006] [permanent neglect]; *Matter of Lovell Raeshawn McC.*, 308 AD2d 589 [2d Dept 2003] [abandonment]; *Matter of April S.*, 307 AD2d 204 [2003], *lv denied* 1 NY3d 504 [2003] [permanent neglect]). This broadens prior judicial holdings from both the Fourth Department and the New York State Supreme Court, Appellate Division, First and Second Departments, in which courts may order post-termination visitation but only when parental rights are terminated due to mental illness or retardation under Social Services Law § 384-b (4) (c) and such visitation is in the child's best interests (*see e.g. Matter of Jasmine Pauline M.*, 62 AD3d 483 [1st Dept 2009]; *Matter of Corinthian Marie S.*, 297 AD2d 382 [2d Dept 2002]; *Matter of Stephen B.*, 176 AD2d 1204 [4th Dept 1991]; *Matter of Angela Marie N.*, 223 AD2d 423 [1st Dept 1996], *lv denied* 88 NY2d 814 [1996]).[1] New York State statutory law does not allow post-termination contact unless a parent surrenders his or her parental rights (*Matter of Gregory B.*, 74 NY2d 77, 91 [1989]

---

1. The New York State Supreme Court, Appellate Division, Third Department, has held that post-termination contact cannot be court mandated under any circumstance (*Matter of William W.*, 23 AD3d 735 [2005] [mental retardation]; *Matter of John KK.*, 34 AD3d 1050 [2006] [permanent neglect]).

[emphasizing that the Legislature should determine which circumstances are amenable to an "open adoption" process]; *see* Social Services Law § 383-c [providing procedures by which a parent may surrender a child conditional upon the retention of visitation rights]).[2]

In *Matter of Kahlil S.* (60 AD3d 1450 [4th Dept 2009], *lv dismissed* 12 NY3d 898 [2009]), a reported decision affirming court-ordered post-termination contact, the Fourth Department held that post-termination visits were in the best interests of one child but not in the best interests of his/her sibling. The *Kahlil* Court did not detail the factors it considered in its best interest analysis (*see also Matter of Christopher J.*, 63 AD3d 1662 [4th Dept 2009], *lv denied* 13 NY3d 706 [2009] [father must request post-termination contact and prove that it is in the child's best interest]; *Matter of Diana M.T.*, 57 AD3d 1492 [4th Dept 2008], *lv denied* 12 NY3d 708 [2009]). Other state jurisdictions where courts are required to consider post-termination contact have outlined best interests factors, including: (1) the child's age; (2) whether there is a potential adoptive resource and the emotional attachment between the resource and child; (3) whether visitation would interfere with any potential adoptive resource; (4) whether a significant bond between the child and the biological parent exists; and (5) the history of parent-child visitation (*see In re Adoption of Vito*, 431 Mass 550, 728 NE2d 292 [2000]; *In re Adoption of Edgar*, 67 Mass App Ct 368, 853 NE2d 1068 [Worcester 2006], *review denied* 447 Mass 1113, 857 NE2d 1094 [2006]; *In re Alyssa W.*, 217 W Va 707, 710-711, 619 SE2d 220, 223-224 [2005]; *In re Stacey D.*, 12 Neb App 707, 719, 684 NW2d 594, 604 [2004]).[3]

Applying these factors here, respondent has not shown that it is in Imani's best interests to continue to visit with respondent. Imani is four years old and has been in the care of Trelawney M., her foster mother, since she was six weeks old. Imani has

---

**2.** A few states provide statutorily for post-termination contact with children, including Florida, Texas and Louisiana (Fla Stat Ann, tit 5, § 39.811 [7] [b] [providing for post-termination contact in some circumstances]; Tex Fam Code Ann § 161.2061; La Child Code Ann art 1037.1 [A]).

**3.** Other states have determined, either by judicial decision or statutory enactment, that their courts do not have the authority to order post-termination contact (*see e.g.* SD Codified Laws § 25-6-17 [abrogating South Dakota Supreme Court decision that allowed circuit courts to order open adoptions and post-termination contact]; *In re Elizabeth D.*, 888 A2d 281, 283 [Me 2006] [holding that "an order terminating parental rights deprives the court of any authority to impose a condition that preserves contact between the parent and the child"]).

bonded with her foster mother; the foster mother plans to adopt Imani; and the foster mother does not support continued visits between Imani and respondent.

The foster mother testified that she fears post-termination contact for both herself and her children as she always questions respondent's mental state and stability.[4] The foster mother testified that since becoming a foster mother, her home has been reported to Child Protective Services over 40 times: each investigation a hardship for all her children (in addition to Imani, Imani's biological sister, Nyaisha, and four other children live in the home). Caseworker Kimberly Cooper testified that respondent made claims against her to police. Respondent was aggressive with Medical Motors drivers who brought Imani to visits, resulting in the cancellation of services.

Although respondent has been generally consistent visiting with Imani, visitation becomes sporadic when respondent is suffering from mental instability as she did this past summer. Ms. Cooper testified that on July 31, 2009, a scheduled visitation day, respondent appeared at the Monroe County Department of Human Services office building frazzled and threatening, using loud profane language, resulting in the visit's cancellation. Respondent called Ms. Cooper days later explaining that she was admitted to St. Mary's Psychiatric Unit where she remained inpatient for approximately three weeks.

Respondent lacks insight into her mental illness; indeed she testified that she was admitted to St. Mary's Hospital for blood work due to anemia but that upon admission she is automatically placed in the psychiatric ward. She testified that she decreased the amount of her Zyprexa medication from 20 milligrams to 5 milligrams. The testimony of Dr. Singh during fact-finding also focused on the danger of respondent's lack of insight into her mental illness. He testified that respondent has the ability to act appropriately with Imani—but only when she is properly medicated and not suffering from active signs and symptoms of her illness.

No doubt respondent and Imani love each other. The foster mother admitted that Imani misses respondent and is upset that Nyaisha continues to visit with respondent while she cannot. Respondent continues to bring Imani gifts to visits including coats, clothes, gifts, toys and food. On August 31, 2009,

---

4. The foster mother did testify that she would both continue to update respondent regarding Imani and provide her with photographs.

Imani went with her foster mother to pick up Nyaisha from a visit and cried when she saw respondent. Yet even Imani's attorney advocates that Imani's continued contact with respondent would cause more harm than good unless visits were closely monitored. Although Imani wants continued contact, her attorney substituted his own judgment as Imani, at age four, has not demonstrated a knowing, voluntary and considered judgment.

Respondent's testimony reveals that she does not fully comprehend that post-termination contact would offer her continued visits but that Imani would be freed for adoption by her foster mother. Respondent testified that she is "willing to work with as many persons as [she has] to get [her] children back." She testified that since her rights were terminated she has spoken with Imani three times on the telephone and each time Imani cries and tells her that she loves and misses her. In response, respondent informs Imani that she "will not stop until [she] get[s] [her] back, to "be good" and that "Mommy will see [her] soon." Conflicting messages such as these will confuse Imani and negate her sense of (and entitlement to) permanency. Respondent did not offer any expert opinion to the contrary.

Now therefore, it is adjudged by a preponderance of the credible evidence that it would not be in Imani's best interests to continue to visit with respondent; and it is further ordered that respondent's request for post-termination contact with Imani is denied.