NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1038

ADOPTION OF CONRAD (and four companion cases[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and the father appeal from decrees of the Juvenile Court that found them unfit to care for their five children, terminated their parental rights, and declined to order posttermination and postadoption visitation.  The mother argues that the judge made numerous errors in considering the evidence and that without those errors, the evidence of the mother's unfitness was insufficient.  The father challenges, among other things, the process by which the children testified at trial.  Both parents also challenge the findings that their unfitness would continue indefinitely and that termination was in the children's best interests.  We affirm.

---

[1] Adoption of Timothy, Adoption of Rose, Adoption of Alice, and Adoption of Julia.  The children's names are pseudonyms.

Background.  We summarize the trial judge's findings of fact, with additional facts reserved for later discussion.

1.  Procedural history.  The mother and the father met when they were both teenagers; their relationship was "on-and-off." Both have long histories of substance use, mental illness, and criminal activity.  There is also a history of domestic violence.  At the close of trial in 2022, the mother and the father had five children:  Conrad (thirteen years old); twins Timothy and Rose (eight years old); Alice (five years old); and Julia (two years old).

The present matter is the second care and protection petition filed against the parents.  The first petition was filed in June 2016, following the removal of the three oldest children due to allegations of substance use, domestic violence, and neglect by the parents.  In September 2016, the mother gave birth to the parents' fourth child, Alice, who was born substance exposed.[2]  A further care and protection petition was filed by the Department of Children and Families (department) on Alice's behalf.

Following a trial of these first cases, the mother and the father regained conditional custody of all four children.  After reunification the cases were dismissed, and thereafter submitted

_____

[2] The mother did not receive prenatal care with Alice.  The mother used heroin up until two days before Alice's birth.

2

for closing on November 19, 2019.  Six days later, however, on November 25, 2019, the department received a fresh report alleging neglect, which detailed bruising on the twins, then five years old, as well as on the mother's face.  Following an investigation, the department conducted an emergency removal and commenced the instant care and protection action on December 6, 2019.

The mother gave birth to the parents' fifth child, Julia, on June 26, 2020, prematurely at thirty-four weeks.  The mother did not receive prenatal care for Julia until she was twenty-eight weeks pregnant.  While Julia was in the hospital, the department filed a further care and protection petition.  Julia was discharged to the department's custody, and has never lived with her parents.

2.  <u>Trial</u>.  The trial occurred over twenty-one nonconsecutive days from June 4, 2021, until July 7, 2022.  Seventeen witnesses testified including, as relevant to the issues on appeal, three of the children (Conrad, Rose, and Timothy) and an Ohio State police trooper.

The children's testimony was taken in July of 2021, using a procedure discussed in more detail <u>infra</u>.[3]  The children

---

[3] Although there was no discussion of the issue during trial, in her findings the judge stated, without explanation, that the children's testimony was admitted only for the children's state of mind.

3

testified to their observations of the father's repeated physical abuse of the mother in their home, resulting in bruising "all over her body."  The children also testified that both the mother and the father hit them with their hands and a belt.  Each child testified that they did not feel safe in their home with the mother and the father.  The children also testified that they would like to remain with their respective preadoptive placements.  In addition to the children's live testimony, the department also submitted reports that contained statements the children had made, including that the children saw the father hit the mother, leaving bruising including on the mother's face, and that the parents hit them.[4]

Following the children's testimony, and in the midst of trial, the parents left on a cross-country road trip.  They were stopped in Ohio by a State trooper.  The trooper appeared at trial and testified that he initially stopped the parents for speeding, but that the stop led to a search of the vehicle, which yielded drug paraphernalia.  The trooper also described a video and audio recording from the cruiser where the parents were held while their vehicle was searched.  The recording was ultimately excluded from evidence, but the trooper testified

---

[4] At trial, both parents denied domestic violence in their relationship.  The mother testified that she was aware of the children's concerns about how the father treated them.

4

that in the recording the mother handed the father an item from her genital area after the father asked if she "had the stuff." As a result of the incident in Ohio, the father was charged with drug trafficking.[5]

3. Findings. The judge found that the mother and the father were unfit and terminated their parental rights. In May of 2023 the judge entered detailed findings of fact and conclusions of law. As to the mother, the judge found that she had significant issues with mental health, substance use, domestic violence in her relationship with the father, housing and employment instability, and criminal behavior. The judge also found that the mother had failed to meaningfully address these issues, and that the evidence showed that the substance use, criminal activity, and domestic violence were ongoing, and likely to continue indefinitely. Although the judge acknowledged that the mother engaged in some services related to her mental health, she had not done so "consistently or earnestly," nor had the mother completed other action plan tasks to better her parenting abilities.

---

[5] The judge erroneously found that the trip caused the mother and the father to miss a scheduled department visit. Where the mother and the father missed several scheduled visits, this was harmless error. See G. L. c. 231, § 119; Adoption of Sherry, 435 Mass. 331, 336 (2001).

5

The judge also found that the parents' relationship was "extremely unstable, toxic, and fraught with domestic violence and criminal activity." The judge concluded that the mother "persisted in her relationship with [the f]ather through this case, despite the ongoing domestic violence and statements that her own children were fearful of their father."

As to the father, the judge noted that he was "adamant that he refuse[d] to work with the [d]epartment or engage in any services whatsoever." The father, "by his own account, had done nothing to address his current situation" and had not "demonstrated any observable changes as to his substance abuse, mental health diagnoses, domestic violence, or criminal history."

The judge concluded that "[n]either parent has taken responsibility for their own behaviors in their relationship . . . [nor has] gained insight into any of the parental deficits which have plagued them throughout this case" and their "lack of insight continues to put the children at risk of further harm if reunified to either parent's custody." Finally, the judge declined to order posttermination or postadoption visitation.

Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the

6

parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Jacques, 82 Mass. App. Ct. 601, 606 (2012). "Parental unfitness is determined by considering a parent's character, temperament, conduct, and capacity to provide for the child's particular needs, affections, and age." Care & Protection of Vick, 89 Mass. App. Ct. 704, 706 (2016). The judge must determine "whether the parent's deficiencies place the child at serious risk of peril" (quotation and citation omitted). Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011). A judge must also decide "whether, 'on the basis of credible evidence, there is a reasonable likelihood that the parent's unfitness at the time of trial may be only temporary.'" Adoption of Ilona, 459 Mass. 53, 59 (2011), quoting Adoption of Carlos, 413 Mass. 339, 350 (1992). "[A] parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Adoption of Ilona, supra at 60.

The judge's findings and best interests determinations are entitled to substantial deference, and we do not disturb the judge's factual findings unless they are clearly erroneous. Adoption of Hugo, 428 Mass. 219, 225 (1998); Adoption of Jacques, 82 Mass. App. Ct. at 606-607.

1. Unfitness of the father. On appeal, the father contends that the judge erred in concluding that his unfitness

7

would continue and in terminating his parental rights.  There was no error.

The father admits that he is currently unfit, and the evidence of his unfitness was overwhelming.  The father had an extensive, ongoing criminal record spanning from 2003 through trial that included charges and convictions of violent, drug, and firearm offenses, for some of which he served committed time.  At the time of trial, the father was facing numerous charges, and during trial, the father incurred more charges, including from the Ohio incident.  The father also had an extensive history of substance use, continuing through trial.  There was evidence that during the pendency of this case, the father overdosed twice.

As detailed below, there also was direct and circumstantial evidence of domestic violence by the father against the mother on numerous occasions, including in the children's presence and sometimes resulting in bruising.  There was also evidence that the father hit the children.[6]

Finally, the father refused to work with the department in any meaningful way.  The father acknowledged his lack of

---

[6] The paternal grandmother obtained abuse prevention orders for herself and all five children against the father due to the father threatening to harm her.  While the father denied this during his testimony, the judge did not credit him.

8

cooperation, testifying that he had done "fucking nothing" for the department.  The judge appropriately concluded that the father's "shortcomings will continue undiminished in the future with an attendant harmful effect on the subject children," and thus, it was in the best interests of the children to terminate his parental rights.[7]

2.  <u>Unfitness of the mother</u>.  There also was no error in the judge's decision to terminate the mother's parental rights. First, the mother had a long history of substance use that affected her care of the children.  She was consistently seen with bruising and track marks, had multiple positive drug screens through 2020, including when she was pregnant with Julia, and Alice was born substance exposed.  The mother's substance use continued through trial and the mother recognized her continued problem with opiates; however, she did not participate in substance use treatment nor provide a relapse prevention plan.[8]

_____

[7] The judge did not abuse her discretion in declining to order posttermination and postadoption visitation with the father.  None of the children had visited with the father since August 2020.  The judge properly considered the relevant factors in concluding that such an order was not necessary for the best interests of the children.  See <u>Adoption of Ilona</u>, 459 Mass. at 63-66; <u>Adoption of Oren</u>, 96 Mass. App. Ct. 842, 848 (2020).

[8] While the mother enrolled in two substance use treatment programs at the beginning of trial, the judge's finding that the mother's enrollment was "disingenuous" was not clear error.  See <u>Adoption of Luc</u>, 484 Mass. 139, 144 (2020).  Indeed, the mother

9

The mother's substance use also related to her lack of prenatal care during her pregnancies with Julia and Alice, and it was appropriate for the judge to note these similarities.  As noted supra, Alice was born substance exposed after the mother did not receive prenatal care, and the mother used heroin up until two days before Alice's birth.  As to Julia, when the mother finally received prenatal care, she had track marks and bruises on her arms and hands, and had a positive drug screen while pregnant.  The judge permissibly could discredit the mother's reasons for her lack of prenatal care, as well as her testimony that Julia was born prematurely because of preeclampsia.[9]  See Custody of Eleanor, 414 Mass. 795, 799 (1993).

Second, the mother had an extensive criminal history spanning from 2007 to 2020.  This history included drug-related charges as well as charges for assault, abuse prevention act violations, and shoplifting.  Several criminal incidents occurred with the father, including the midtrial incident in

stated she enrolled herself in those programs "knowing the trial was coming."

[9] The judge erroneously stated that Julia was also born substance exposed.  Given the other evidence of the mother's unfitness as to Julia, this error was not material.  See G. L. c. 231, § 119; Adoption of Sherry, 435 Mass. at 336.

Ohio.[10]    There was a clear nexus between the mother's criminal behavior and harm to the children.  Indeed, the mother had been arrested while the children were in her care.[11]

Third, there was ample evidence that the mother did not have stable housing or means to support the children.  At the time of trial, the mother had lived in the maternal grandmother's home for approximately three months, where she planned to reunite with the children.  Before that, the mother stayed with the father in different hotels and apartments and had twice been evicted for nonpayment of rent.  As to the mother's employment, the record supports that it was sporadic, and the judge could permissibly discount the mother's testimony that she was employed at the beginning of trial.  See Custody of Eleanor, 414 Mass. at 799.

---

[10] The judge erroneously found that both the mother and the father incurred drug trafficking charges as a result of the incident.  This was harmless error.  See G. L. c. 231, § 119; Adoption of Sherry, 435 Mass. at 336.

[11] The father and the mother argue that the testimony of the Ohio trooper concerning the excluded videotape was erroneously admitted, and thus should not have been considered as to the mother's criminal history.  We note that neither counsel for the mother nor the father moved to strike the trooper's testimony regarding the videotape after the videotape itself was excluded -- and we note as well that it was unclear why the videotape was not admissible evidence.  Moreover, it was not the videotape but the trooper's testimony of his observations that established the presence of drug paraphernalia in the parents' car.

Beyond these shortcomings, the mother had a pattern of inconsistent treatment for her mental health diagnoses of attention deficit hyperactivity disorder, bipolar disorder, and depression.  While the mother testified that she had a new psychiatrist, they had yet to meet.  The mother's mental health had a nexus to her ability to care for her children:  the mother acknowledged that her mental health resulted in financial difficulties, and the children recognized the mother's mental health symptoms, stating that the mother stayed in bed throughout the day and at times was unable to drive them to school, resulting in their frequent tardiness.  See Adoption of Luc, 484 Mass. 139, 146-147 (2020); Adoption of Frederick, 405 Mass. 1, 9 (1989).

And finally, there was very concerning evidence of domestic violence upon the mother by the father.  This included direct evidence -- the children's testimony and the children's statements regarding domestic violence that appeared in the department reports admitted at trial.  Leaving aside the question of whether it was proper for the judge to rely on this evidence, which we discuss infra, there was also strong circumstantial evidence of domestic violence -- the mother was

12

seen with bruising on numerous occasions, not just by her children but also by social workers and medical professionals.[12]

The mother denied experiencing domestic violence, and did not follow through with services related thereto, despite it being on her action plan. The mother also did not appreciate the effect that witnessing domestic violence had on the children and took no action to address the children's statements that they did not feel safe with the father.[13] See Adoption of Arianne, 104 Mass. App. Ct. 716, 723 (2024). She stated that the children fabricated their statements that the father hit her. The judge appropriately concluded that the mother's "failure to terminate her relationship with [the f]ather demonstrate[d] her inability to put her children's needs above her own."

Many of the mother's issues in the current proceeding were present in the previous petition. The mother did not complete most of her action plan tasks and failed to show sufficient progress. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019). Thus, there was no evidence that the mother's

---

[12] The judge was not required to credit the mother's explanations that the bruising arose from Alice hitting the mother's face or as a side effect of prescribed blood thinners. See Custody of Eleanor, 414 Mass. at 799.

[13] There were numerous police responses to the parents' home due to neighbors hearing arguments.

circumstances had changed or would change in any meaningful way. See Adoption of Edgar, 67 Mass. App. Ct. 368, 373 (2006).[14]

3. The children's testimony. Both parents challenge the judge's reliance on the testimony of Conrad, Timothy, and Rose, arguing that the judge improperly limited the cross-examination of the children such that the parents were denied the ability to "rebut adverse allegations concerning [their] child-rearing capabilities" (citation omitted). Adoption of Luc, 484 Mass. at 152.[15] See Adoption of Roni, 56 Mass. App. Ct. 52, 55 (2002). The mother also argues that the children's hearsay statements in the department's G. L. c. 119, § 51B, and court investigation reports could not be considered as evidence, for the same reason. See Adoption of Luc, supra at 152-153 (hearsay

---

[14] In light of the issues above, the judge also did not abuse her discretion in declining to order posttermination and postadoption visitation with the mother where such an order was not necessary to protect the children's best interests. See Adoption of Ilona, 459 Mass. at 63-66. Among other things, the mother had extensive, ongoing contact with the father, the children were well bonded and doing well in their preadoptive placements, and the children's caretakers were willing to allow visits as long as they were in the best interests of the children.

[15] In her findings the judge stated, in a footnote, "Throughout these findings, the Court admitted any and all of the subject Child's [sic] statements for the limited purpose of understanding her [sic] state of mind. See Mass. G. Evid. § 1115(d)(1) (2020)." We discern no material error in this regard because, as discussed infra, we perceive no reason on this record why the children's testimony could not be relied upon generally.

14

contained within department records admissible for statements of primary fact if hearsay source is identified and available for cross-examination). See also Mass. G. Evid. § 1115(b)(2) (2024). The father argues similarly, adding that the judge's limitations and accommodations to the children violated due process and that such limitations and accommodations could not be imposed without expert evidence demonstrating that the children would be traumatized if they testified in the ordinary manner.

The judge allowed the testimony of the three oldest children (ages twelve, seven, and seven at the time of their testimony), subject to specific procedures that the judge set after input from the parties. In particular, the judge ordered that the lawyers would not ask the questions; rather, the parties would submit proposed questions to the judge in advance, and the judge would conduct the examination of each child. The procedure contemplated that the parties could submit proposed follow-up cross-examination questions during a recess after each child's direct examination, but no face-to-face cross-examination by counsel would be allowed; instead, the judge would conduct the follow-up cross-examination of each child. The parents would not be present in the court room, but could watch the proceedings by videoconference. The judge expressly found that the procedures were necessary because it would be

15

traumatic for the children to testify with their parents in the court room and to be questioned by seven different attorneys.

Thereafter, the department, counsel for the mother, and counsel for the father submitted proposed questions. The judge conducted the questioning. After each child was questioned, the court took a recess, and the judge asked counsel to confer with their clients and to submit any additional questions. At the close of each child's testimony and after the recesses, the judge asked additional questions of each child.

We recognize that "[d]ue process concerns and fundamental fairness require that a parent have an opportunity effectively to rebut adverse allegations concerning child-rearing capabilities, especially in a proceeding that can terminate all legal parental rights." Adoption of Luc, 484 Mass. at 152, quoting Adoption of Mary, 414 Mass. 705, 710 (1993). This includes the opportunity to conduct reasonable, "effective cross-examination," and we assume, without deciding, that this right presumptively includes the ability to cross-examine the witnesses directly, rather than through written questions asked by a judge.[16] We further recognize that the parents' arguments

_____

[16] "Effective cross-examination" will generally involve the opportunity to question the witness directly and to follow up in real time. Variance from this process will require unusual circumstances, and findings by the judge. Cf. Adoption of Roni, 56 Mass. App. Ct. at 57 ("[A]ny order limiting parties' access to, or participation in, any portion of the proceedings [should]

go not only to the children's court room testimony, but also to the admissibility under the Luc criteria of the children's hearsay statements in the department's reports. See Adoption of Luc, supra at 152-153.

Here, however, the parents' due process and related arguments regarding the limits on cross-examination do not establish reversible error. First, the arguments have not been properly preserved for our review. Prior to the taking of evidence, while the judge was working out a process, the parents did raise some objections. As to the procedure of written questions, the parents stated that written questions "do[] not allow for follow-up, do[] not allow for spontaneity." The parents did not, however, specifically argue that the judge was violating a due process right to have counsel question the children directly. Further, neither the father nor the mother objected at the conclusion of the children's testimony, nor did they, for example, make an offer of proof as to what evidence they believed they could have adduced if they had been allowed to question the children directly.

Moreover, the parents have not provided an adequate record to review the claimed error. The record before us does not

be narrowly tailored to the particular protection required in the circumstances, explained by the judge and supported by explicit findings").

17

include the contents of the judge's conversations with the parties during the recesses, and neither parent sought to reconstruct the record on that point. As a result, we do not know of particular questions that were requested during the recesses but not asked.[17] At most, the father argues on appeal that the parents were unable to explore the children's potential biases and suggestibility. However, the children were asked several questions on that topic.[18]

Finally, and relatedly, the parents have not shown how they were prejudiced by the process here. As noted, they have not shown that they had additional questions to ask, or what facts they could reasonably have anticipated establishing through cross-examination that could have had a material impact on the proceedings. The children's testimony primarily involved the issue of domestic violence, but the evidence of unfitness, detailed above, involved far more than domestic violence. Thus,

---

[17] There was a conversation on the record after the recess following Conrad's testimony where the judge responded that she had asked a question already and that she was "not going to ask anything that's based on regular cross. It's got to be based on the direct." However, we have no record of the questions to which the judge was referring.

[18] As to the absence of expert evidence supporting the judge's procedure, while "[a]n order allowing a child to testify outside the presence of [his or] her parents to avoid trauma should ordinarily be supported by an explicit finding to that effect," Adoption of Roni, 56 Mass. App. Ct. at 55, (and the judge made such a finding here), our courts have not required expert testimony to support the type of order at issue.

18

even if the judge's reliance on the children's testimony and hearsay statements was error (and we do not hold that it was), it was not prejudicial in light of the other overwhelming evidence concerning the mother's and the father's unfitness.

<u>Decrees affirmed</u>.

By the Court (Sacks, Englander & Grant, JJ.[19]),

Clerk

Entered: January 10, 2025.

---

[19] The panelists are listed in order of seniority.