NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-1355

ADOPTION OF VALETTA (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found that the father was unfit to parent the children, Valetta and Ryan, and that each of their best interests would be served by the termination of his parental rights, but ordered that the father be permitted posttermination and postadoption visits with the children.  The father appeals from the decrees, arguing that the judge based the finding of unfitness on exaggerations of the father's criminal history, and his sobriety for almost two years before trial precluded a finding that he would remain unfit for the foreseeable future.  The father also argues that the judge did not consider the best interests of the children in ordering that the father's visits occur at the same time as the mother's, and

_____

[1] Adoption of Ryan.  The children's names are pseudonyms.

should have ordered more than four annual postadoption visits for the father.  We affirm.

Background.  For several years, the father struggled with misuse of opioids.  In about 2019, the father underwent rehabilitation and began taking Vivitrol shots to curb his cravings for opioids.

In 2019, the father and the mother began a relationship and the mother became pregnant.  Beginning when the mother was six months pregnant, they lived together in the paternal grandmother's home.  The father knew that the mother had a history of marijuana use, but testified at trial that he did not know that during the pregnancy she tested positive for marijuana and cocaine and missed prenatal medical visits.

Valetta was born in August 2020.  Because she tested positive for marijuana and cocaine at birth, a report alleging neglect by the mother was filed with the Department of Children and Families (DCF) pursuant to G. L. c. 119, § 51A (51A report).  When the father learned of the 51A report he became upset, stating, "marijuana is legal," which the judge found minimized the significance of Valetta's exposure to marijuana.  The father told a DCF emergency response worker that he did not use illegal substances, had been sober from heroin for seventeen months, and was taking Vivitrol shots.  When Valetta was two days old, DCF assumed emergency custody of her.  In response to DCF's

2

involvement, the father became combative and irate, saying he would not allow "fucking DCF" into his home and that he would "fight anyone" who tried to take Valetta from him.  Five security guards, with assistance from several police officers, escorted him from the hospital and told him not to return.

DCF initiated this care and protection proceeding concerning Valetta.  At the seventy-two hour hearing, the father testified that the mother had moved out of his home; he would have support in caring for Valetta from the paternal grandmother, his cousin, and his aunt (great aunt); and he was taking Vivitrol shots.  On August 10, 2020, the judge granted temporary custody of Valetta to the father with conditions including that the mother was not to have unsupervised contact with Valetta or to reside with the father, and the father was to refrain from the use of alcohol and substances.  The judge appointed a court investigator with whom the father was not forthright about his criminal or substance abuse history; he denied the presence of any domestic violence in his relationship with the mother, which the judge did not credit.

After the conditional custody order was in place, the father stopped taking Vivitrol because he believed he no longer needed it.  Unbeknownst to DCF or the court, the mother was living with the father and Valetta; at trial the father admitted that fact, and the judge credited his testimony.  By January

3

2021, the mother was again pregnant by the father. During the pregnancy, the mother tested positive for Suboxone, morphine, fentanyl, and marijuana.

Ryan was born in September 2021. In the hospital, the mother tested positive for fentanyl; when informed of the result, the father became upset and said that only a "low level" was detected. Ryan tested negative for all substances, but due to concerns of the mother's substance use, a 51A report alleging neglect by the mother was filed. DCF assumed emergency custody of him, placed him in a foster home, and initiated a care and protection proceeding.

On November 1, 2021, the judge granted temporary custody of Ryan to the father on the same conditions as his custody of Valetta. Interviewed by the court investigator, the father said he and the mother were in a relationship and that she visited him and the children for two hours on Monday through Thursday, supervised by the great aunt. In fact, the mother was living with the father and the children. The father told the court investigator that he did not want custody of the children by himself, but rather wanted the family to be reunited, including the mother. At trial, the father testified that it was "unfair" that the mother was "kicked out" of his home.

In November 2021, the father relapsed on opioids. At trial he testified that he relapsed because it was difficult caring

4

for both children.  He did not seek support from the paternal grandmother, but instead allowed the mother to live in the home to care for the children.  He also hid his relapse from his family and DCF.

Shortly before 10 P.M. on December 2, 2021, at his home, the father found the mother unresponsive in the bathtub with her head submerged in water.  The mother was taken by ambulance to a hospital and diagnosed with loss of consciousness and respiratory distress.[2]  A 51A report was filed alleging the mother's neglect of the children, who were then sixteen months and three months old.  The 51A report also alleged that the father was currently under the influence of fentanyl and that there was domestic violence between him and the mother.

The mother told the ongoing social worker that she had no memory of what happened in the bathtub.  She disclosed that, two days before, she and the father had a "heated argument" about her access to the children, and in the past the father had put his "hands on" her and the violence was ongoing.  The judge credited the mother's statements to the social worker.

Interviewed on December 6 by the social worker, the father lied about whether the children were present in his home when

_____

[2] Testing at the hospital revealed benzodiazepines and fentanyl in the mother's system, but both of those substances were administered during treatment.

5

the mother passed out in the bathtub. He claimed that the mother had asked to take a bath at his home, and he brought the children to the great aunt's home before the mother arrived; he was not concerned that he had disrupted the children's routine so that the mother could take a bath. At trial, the father admitted that the children were at his home when the mother passed out in the bathtub; at one point, he testified that Valetta "was in the tub" with the mother, then changed his testimony to say that he was bringing Valetta to the tub when he found the mother unconscious.

After the ongoing social worker told him in the December 6 interview that the 51A report alleged that he was under the influence of fentanyl, the father denied that he used drugs, which the judge did not credit. The father said that he had been submitting urine screens to his probation officer and had never tested positive. He denied falsifying tests. Asked to undergo a hair follicle test, the father said he would speak to his attorney.

Shortly after that interview, the father telephoned the ongoing social worker and admitted that three weeks previously he had relapsed on opioids. The father began inpatient detoxification.

On December 7, 2021, DCF was granted temporary custody of the children. That day, two 51A reports were filed alleging

neglect of the children by the father. One of them alleged that the father had permitted the mother to live with the children in violation of the conditional custody orders. The other 51A report alleged that the father had falsified supervised urine screens by using a "penis-like device" to dispense clean urine. The court investigator learned that, during the three-week period when the father later admitted he had relapsed, he had submitted to a urine screen with his probation officer and no substances were detected.

After his discharge from detoxification, the father entered an intensive outpatient program and resumed Vivitrol injections. In May 2022, shortly after completing the intensive outpatient program, the father again stopped taking Vivitrol and then relapsed using fentanyl. He overdosed and was found lying face down on the front steps of his home by police, who revived him with Narcan. He did not disclose his relapse to DCF or seek supports. The judge found that when the father was describing that relapse at trial, he was "laughing"; he testified, "I just went off edge." The father underwent a seven-day rehabilitation program and then entered an intensive outpatient program and resumed Vivitrol. On June 10, 2022, the father stipulated that he was then unfit to parent the children.

Around November 2022, the father again stopped taking Vivitrol. He did not inform DCF that he had done so; in fact,

in early 2023, he repeatedly told the social worker that Vivitrol was helpful to him, which the judge found was dishonest.  At trial, the father testified that he believed he did not have to inform DCF that he had stopped Vivitrol because "it was my choice."

Between their removal in December 2021 and trial in February 2024, the children were separated, each in several foster placements.  On February 10, 2023, DCF's goals for both children were changed to adoption, with the plan for them to be adopted together.  As of trial, DCF had received inquiries from the great aunt and from a maternal second cousin, but no preadoptive family had been determined.

Discussion.  1.  Termination of parental rights.  "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citations omitted).  Adoption of Arianne, 104 Mass. App. Ct. 716, 720 (2024).  "The judge must also find that the current parental unfitness is not a temporary condition" (quotation and citations omitted).  Id.  "We give substantial deference to the trial judge's decision to terminate parental rights 'and reverse only where the findings of fact are clearly

erroneous or where there is a clear error of law or abuse of discretion.'" Id., quoting Adoption of Valentina, 97 Mass. App. Ct. 130, 137 (2020). "An abuse of discretion exists where the decision amounts to a clear error of judgment that falls outside the range of reasonable alternatives" (quotations and citations omitted). Adoption of Xarissa, 99 Mass. App. Ct. 610, 616 (2021).

a. Father's unfitness. The father argues that the judge erred in concluding that DCF proved that he was currently unfit to parent the children. The father contends that the judge impermissibly reached that conclusion by exaggerating his criminal history, and no nexus was proven between his past combativeness and his parenting ability.

As mentioned, the judge considered evidence of the father's belligerence at the hospital after Valetta was born. In addition, the judge noted that based on a fight in 2008, the father was convicted of assault and battery, and charges of assault by means of a dangerous weapon (a firearm) and assault and battery by means of a dangerous weapon (a shod foot) were continued without a finding.

As to the father's more recent criminal history, we are not persuaded by the father's claim that the judge "exaggerated" it by relying on police reports pertaining to unproven criminal charges. Beginning in January 2021, DCF's action plan tasks for

9

the father included that he refrain from illegal activity and notify DCF of any police involvement within twenty-four hours. The judge found that the father failed to inform DCF of the following: a June 2021 police investigation regarding an allegation that he had hit someone with a baseball bat; a May 2022 overdose where police revived him with Narcan; a July 2023 arrest for assault by means of a dangerous weapon after he allegedly threatened to stab a man with a knife; and January 2024 charges of motor vehicle offenses.

The father's "unwillingness to adhere to DCF's service plan," including the requirement that he promptly report any police involvement, was relevant to the judge's determination of his unfitness. Adoption of Luc, 484 Mass. 139, 147 (2020). This is so even if the police involvement did not result in a criminal conviction. See Care & Protection of Frank, 409 Mass. 492, 497 (1991) (police observations of mother's criminal conduct were "relevant to the issue of parental fitness," although they did not give rise to convictions).

Nor are we persuaded by the father's argument that DCF did not present evidence permitting the judge to find that the father's history of combative and aggressive behavior impacted his fitness as a parent. After the children were removed, DCF asked the father to complete an intimate partner violence program due to the reported history of domestic violence between

10

him and the mother.  The judge found that the father lacked insight into why DCF required him to complete that program.  The father was terminated from the program, was not honest with DCF about why he was terminated, and never re-engaged in such a program.

The judge concluded that the "[f]ather's inability to fully acknowledge his history of violence, including his inability to be forthright with collaterals, the court investigator, and [DCF], renders him incapable of protecting the children from future abuse or witnessing abuse."  We discern no error of law or abuse of discretion in that conclusion.  See Adoption of Lisette, 93 Mass. App. Ct. 284, 294 n.15 (2018) ("A parent's willingness to ignore or minimize abusive behavior can be an indicator of unfitness, regardless of whether the child is at risk of abuse or witnessing abuse").

b.  Likelihood of prolonged unfitness.  Based on factors including the father's substance use disorder, "a condition which is reasonably likely to continue for a prolonged indeterminate period," G. L. c. 210, § 3 (c) (xii), the judge concluded that "there is no reasonable expectation that Father will be able to provide proper care or custody of the children, within a reasonable time, and the children require and deserve permanence."  The father contends that DCF did not prove that his parental unfitness was likely to continue, and the judge did

11

not take into account evidence that the father had maintained his sobriety for about twenty-two months before trial. Based on the evidence of the father's unwillingness to engage in substance abuse treatment, the judge did not abuse his discretion in concluding that there was no reasonable expectation that the father would be fit to parent the children within a reasonable time.

"Treatment 'does not always work the first or even the second time, [and] relapse should not be cause for giving up on' an individual experiencing substance use disorder" (citation omitted). Adoption of Luc, 484 Mass. at 147. "[P]arental rights should not be terminated only because the parent has a substance use disorder." Id. Even so, "the parent's willingness to engage in treatment is an important consideration in an unfitness determination where the substance dependence inhibits the parent's ability to provide minimally acceptable care of the child[ren]." Id. "Because childhood is fleeting, a parent's unfitness is not temporary if it is reasonably likely to continue for a prolonged or indeterminate period." Adoption of Ilona, 459 Mass. 53, 60 (2011).

Among the father's action plan tasks were to engage in substance abuse treatment, undergo frequent supervised urine screens, and attend three to five twelve-step meetings weekly. The judge found that the father did undergo substance use

12

treatment, and maintained sobriety for periods of time with the help of Vivitrol, but then stopped Vivitrol and relapsed in November 2021 and again in May 2022. The judge found that the father failed to sufficiently verify his attendance at twelve-step meetings. For six months before trial, the father was not engaged in any substance abuse services. About six months before trial, the father submitted a clean urine sample that was not at the proper temperature; at trial, he had no explanation for the discrepancy, and the judge found it "suggest[ed] he may have tampered with the sample." The father never complied with DCF's request to undergo hair follicle testing. As of trial, he still was not taking Vivitrol; he testified that he stopped taking it because he had a "sober plan" and a "routine." Asked at trial to describe the impact of his substance use on the children, the father instead described how not seeing the children impacted his mother and his brother. Asked if he would use drugs in the future, the father testified that he did not know.

Based on that evidence of the father's lack of willingness to continue to engage in treatment for his substance use disorder, the judge did not commit clear error or an abuse of discretion in concluding that the father's parental unfitness was likely to continue. See Adoption of Luc, 484 Mass. at 147.

13

2.  Visitation.  The judge ordered that the father be permitted visits with both children monthly posttermination and four times annually postadoption, and that those visits take place "at the same time as" the mother's visits, "for the benefit of the children."  The father contends that the judge abused her discretion in ordering that the father's visits occur at the same time as the mother's.

"A trial judge's decision whether to order visitation between a child and a parent whose parental rights have been terminated is reviewed for an abuse of discretion."  Adoption of Xarissa, 99 Mass. App. Ct. at 623.  A postadoption contact order may be warranted "where no preadoptive family has yet been identified, and where a principal, if not the only, parent-child relationship in the child's life remains with the biological parent."  Adoption of Edgar, 67 Mass. App. Ct. 368, 371 (2006), quoting Adoption of Terrence, 57 Mass. App. Ct. 832, 839 (2003).

We discern no abuse of discretion in the judge's order that the children's posttermination and postadoption visits occur with the father and the mother at the same time.  That order is within "the range of reasonable alternatives," Adoption of Xarissa, 99 Mass. App. Ct. at 616, because it seeks to minimize the disruption to the children's lives as they "negotiate[] . . . the tortuous path from one family to another," Adoption of Vito, 431 Mass. 550, 565 (2000).  If circumstances change and

14

simultaneous visits with both biological parents are no longer in the best interests of the children, the children or their custodian, whether DCF or an adoptive parent, may seek to modify the order.  See Adoption of Edgar, 67 Mass. App. Ct. at 369-370. As for the father's argument that four postadoption visits annually are not sufficient, we similarly find no abuse of discretion.

Decrees affirmed.

By the Court (Grant, Brennan & Smyth, JJ.[3]),

Clerk

Entered:  November 3, 2025.

---

[3] The panelists are listed in order of seniority.

15